[No. 66693-8.   En Banc.]
Argued March 27, 2001.    Decided July 19, 2001.

THE STATE OF WASHINGTON, *Respondent*, v. HENRY LEWIS MARSHALL, *Appellant*.

---

*Henry L. Marshall*, pro se.

*Eric J. Nielsen* and *Eric Broman* (of *Nielsen, Broman & Associates, P.L.L.C.*) and *Judith M. Mandel* and *Ronald D. Ness* (of *Ronald D. Ness & Associates*), for appellant.

*Gerald A. Horne, Prosecuting Attorney*, and *Barbara L. Corey-Boulet* and *Kathleen Proctor, Deputies*, for respondent.

SANDERS, J. — Henry Lewis Marshall pleaded guilty to aggravated first degree murder and was sentenced to death. In addition to our mandatory proportionality review Marshall now raises numerous issues relating to his plea and sentencing. However, because the trial court denied Marshall's motion to withdraw his guilty plea based on asserted lack of competence while failing to convene a required competency hearing pursuant to chapter 10.77 RCW, we vacate the guilty plea, reverse the conviction, and remand.

## I

## FACTS

*A. Background*

On the morning of June 18, 1994, the 38th Street Pub in Tacoma was robbed. During the course of the robbery the

perpetrator shot and killed Dennis Griswold, the owner of the business. Marshall was charged by the Pierce County prosecutor on June 27, 1994, with the aggravated first degree murder of Dennis Griswold in violation of RCW 9A.32.030(1)(a) and RCW 10.95.020(9). One aggravating factor was alleged: that Marshall killed Griswold in the course, furtherance, or flight from the crime of first or second degree robbery. Marshall pleaded not guilty at his initial arraignment on June 30, 1994.

### 1. Change of Plea to Guilty

On November 2, 1994, Marshall's appointed counsel requested a hearing to allow Marshall to change his plea to guilty, contrary to the advice of defense counsel. Both of his attorneys attempted to persuade Marshall against changing his plea, vainly arguing he should at least wait until the prosecutor decided whether to seek the death penalty. They also consulted with three other individuals to determine whether Marshall was mentally competent to enter such a plea. Chaplain Hack Yadon spent considerable time with Marshall during the week prior to the plea and believed he was rational. Dave Stewart, the jail's mental health professional, also saw Marshall and thought he was rational. Upon defense counsel's request Dr. Brett Trowbridge, a psychologist and licensed attorney, evaluated Marshall to determine whether he was competent to enter a plea. After a two hour interview the night before the plea Dr. Trowbridge also opined Marshall was competent, rational, and understood the consequences of his actions. None of these individuals was called to testify at the change of plea hearing, however.

At the hearing the trial court engaged in a summary colloquy with Marshall, asking about his plea, his competency, the nature of his offense, the potential consequences of his decision, and whether he had discussed the issue with his attorneys. Most of the questions could be answered yes or no. Concluding he was competent, the court then allowed

Marshall to read a prepared statement in which he apologized to Griswold's family and friends and to the court, asked for their forgiveness, and indicated his desire to plead guilty against the advice of counsel. The court accepted Marshall's plea.

Twelve days after Marshall changed his plea the prosecutor notified him of his intent to seek the death penalty.

In January 1995 Marshall's appointed counsel moved to withdraw. New attorneys were then appointed.

*2. Motion to Withdraw Guilty Plea*

In 1997 Marshall moved to withdraw his guilty plea claiming he was not mentally competent at the time he entered the plea to have knowingly, intelligently, and voluntarily waived his right to a trial. Without convening a statutory competency hearing, the court heard three experts in support of the defense motion as well as the testimony of defense consultant Trowbridge over defense objection.[1]

Dr. Barbara Jessen, a neurologist, testified Marshall's MRI (magnetic resonance imaging) scan on January 22, 1996, showed an unusual amount of brain abnormality for somebody who isn't "lying in a hospital." Report of Proceedings (RP) at 351. Of the hundreds of MRIs she had reviewed, she testified she had never seen a person present himself as well as Marshall with his level of brain atrophy. Dr. Jessen testified Marshall's ability to respond to stimulation and make decisions placed him in the fourth percentile of the population and "he is way out in the abnormal range." RP at 357. She opined Marshall's brain abnormalities were present in 1994, before the change of plea was allowed.

Dr. James Maxwell, a neuropsychologist, administered intelligence tests on which Marshall scored in the average-to-low-average range. In another I.Q. test, the Halstead-Reitan, Marshall scored in the lowest first percentile. Dr.

---

[1] Dr. Trowbridge had been retained by previous defense counsel to render an opinion about Marshall's competency when he initially chose to change his plea.

Maxwell met with Marshall three different times and noticed changes in his behavior corresponding to changes in his medication. He testified Marshall had significant brain damage leading to long-standing brain dysfunction. Dr. Maxwell testified Marshall was not competent to enter a plea in November 1994 because Marshall did not understand he would go to prison as a consequence of pleading guilty. Furthermore, Dr. Maxwell testified it would not be possible to determine whether a person could know the consequences of his or her actions based only on the two tests administered by Dr. Trowbridge.

Dr. Dorothy Lewis, a psychiatrist, interviewed Marshall for five hours and reviewed numerous medical records to reach her conclusion that Marshall suffered from bipolar mood disorder or manic depressive disorder. She investigated whether Marshall's bipolar disorder had a genetic component and testified both his father and mother were emotionally unstable people who physically and sexually abused him. Additionally, she noted Marshall's sister, brother, and half-sister had all been suicidal and exhibited signs of bipolar disorder. Dr. Lewis testified blood flow to different parts of Marshall's brain was restricted. This, in her opinion, adversely affected his ability to think, reason, and control himself.

Dr. Lewis also testified Marshall had been diagnosed as a paranoid schizophrenic by the Pierce County jail health clinic seven weeks after the offense and a few weeks before he entered his plea. Over the next several weeks he suffered from a psychotic illness with paranoia accompanied by auditory hallucinations, which was intermittently treated by several medications. However, Marshall had gone off this medication by the time of his plea. Dr. Lewis summarized her opinion that Marshall could not freely and voluntarily waive his constitutional rights because he was delusional and suffering from a psychotic depression at that time. She was also critical of Dr. Trowbridge's evaluation of Marshall's competency, opining he failed to recognize Marshall had been off his antidepressant medication for

several weeks, and indicating Marshall's plea was "a manifestation of his increasingly depressed and delusional state of mind." RP at 664.

In response to this expert testimony presented to show Marshall's lack of competency, the state called Dr. Trowbridge. Dr. Trowbridge testified he evaluated Marshall at the request of defense counsel for two hours on the day before he entered his guilty plea. Marshall scored in the dull-normal range of an I.Q. test performed by Trowbridge—placing him in the lowest 15 percent of the population. However he scored "very well" on another brain-functioning test which placed him in the 86th percentile. Dr. Trowbridge was dismissive of the disparity between the two tests saying, "it is something to think about," but attributed the difference to the correlation between level of attained education and higher I.Q. scores. RP at 495-96. Although Dr. Trowbridge diagnosed Marshall as "mildly depressed," he noted it would be unusual for anyone in Marshall's position not to be somewhat depressed and he could not detect any major mental illness. Dr. Trowbridge, an attorney, testified he was aware of the premeditated intent element of aggravated murder. Marshall told him the shooting was accidental and "I did not intend to kill him." RP at 514. Dr. Trowbridge said the fact Marshall wanted to plead guilty to a premeditated intentional murder raised a question in his mind about Marshall's competency so he "made a note of it." RP at 516. Nonetheless, based upon his examination, Dr. Trowbridge concluded Marshall was competent to enter the guilty plea.

Dr. Trowbridge said he would have liked more time to evaluate Marshall and perform additional tests but the plea hearing was the next day so he was unable to review any of Marshall's records. He admitted he did not know Marshall had been diagnosed by the health clinic as a paranoid schizophrenic or that he had been treated with both antipsychotic and antidepressant drugs less than three months before the plea. Dr. Trowbridge also acknowledged he did not know Marshall was suicidal at the time he

entered his plea, but said he would have talked with Marshall about it had he known. Nor did he know Marshall suffered from brain atrophy, though he said it would have been "interesting" to know at the time of his evaluation. Moreover, Dr. Trowbridge did not review Marshall's letter to the court and the prosecutor in which he confessed his crime, which he sent two days before the evaluation. Dr. Trowbridge agreed that if the letter suggested delusional thinking, as Dr. Lewis testified, it would have been important to his evaluation. Dr. Trowbridge admitted the letter did not make sense and said he would have questioned Marshall about it had he seen it.

The court denied Marshall's motion to withdraw his guilty plea despite finding "[i]t is clear that [Marshall] has impairment. It is clear that there is brain atrophy." RP at 701. The court also based its decision on its interaction with Marshall at the plea hearing saying, "I recognize that I'm not a mental health professional, and I recognize that I am drawing conclusions based upon [Marshall's] demeanor, the manner of his responses, and some of the other things that were going on in the courtroom at that time, but I think I'm entitled to do that and I think that I am probably just as competent as anyone to draw such conclusions." RP at 708.

## B. Penalty Phase Proceeding

During the penalty phase Dr. James Maxwell, who testified at the hearing on the motion to withdraw guilty plea, testified Marshall scored in the impaired range on a number of tests he had administered. The tests indicated Marshall could not plan, had little judgment, and Marshall's ability to reason, solve problems, and make sense of the world around him was impaired. Marshall acted impulsively and Dr. Maxwell believed he suffered from neurocognitive dysfunction caused by serious brain damage. Maxwell testified Marshall was as impaired as a person who is mentally retarded.

Dr. Barbara Jessen, who had testified at the hearing to withdraw guilty plea, said Marshall's MRI revealed the decision-making area of his brain had shrunk significantly

and was considerably smaller than a normal brain. The MRI also showed the folds in Marshall's brain were more pronounced and he had brain atrophy. The EEG (electroencephalogram) showed Marshall's brain electrical activity at a much slower frequency than that of a normal person, and the SPECT (Single Photon Emission Computed Tomography) Scan showed abnormal blood flow to the brain. Clear evidence of brain damage existed according to Jessen. She also testified only five out of one hundred people would be worse at understanding and comprehending things, only seven out of one hundred people have a worse memory, and only five out of one hundred are worse when it comes to decision making. Jessen believed head trauma was the likely cause of Marshall's brain damage.

Marshall's uncle, Roger Marshall, said he witnessed Marshall's father physically abusing him, including being knocked out with a punch when he was 13 years old and being beaten with a bamboo fishing pole. Marshall's father bred wolf-dog hybrids. He intentionally mistreated the animals so they would snap at people and fed them gunpowder to eat away their brains to make them even meaner. Roger Marshall said Marshall's father told him if the kids ever "gave him any shit," he would throw them in the pen with the dogs. RP at 3274. A few days later, Roger Marshall noticed Marshall had bite marks on the back of his legs, which Marshall said he sustained when his father threw him in the pen with the wolf-dogs. Marshall's father then beat him for allowing the dogs to bite him.

Marshall's brother, Richard Marshall, testified Marshall was severely physically and mentally abused growing up. They were beaten by their mother with electrical cords, hoses, and whatever else she could find. Marshall was apparently always beaten the worst even when his siblings got into trouble because he was the oldest and was not allowed to let his brothers and sisters get into trouble. Richard Marshall said their father, in addition to physically and mentally abusing them, sexually abused them by forcing them to have oral and anal sex with him at gun-

point. Their father would hit them unexpectedly to teach them to be "on guard," and he beat them consistently with a cribbage board. He would also force the brothers to fight and then force the winner to fight with him. Richard Marshall saw his father beat Marshall into unconsciousness on at least one occasion. He credited Marshall with helping him escape their father when they became teenagers.

Another witness said the only time he met Marshall's father he saw him hit Marshall in the face with a closed fist. He said Marshall had fresh bruises and marks on his body every day and, by the time he was a teenager, could no longer carry on a normal conversation and had no attention span. Linda Blye testified Marshall lived with her family and had a very special relationship with her three children and was very good to them. She said he was never able to keep a job and became frustrated with his inability to function properly.

The jury did not find sufficient mitigating circumstances to warrant leniency. Marshall was sentenced to death.

## C. Postsentencing Proceedings—Dodd Hearing

During the pendency of our mandatory review Marshall moved to waive his appeal and then withdrew and reinstated that request on three different occasions. In response to the third such request the state asked for and received a hearing on remand to determine whether Marshall had knowingly and intelligently waived his right to appeal. *See State v. Dodd*, 120 Wn.2d 1, 838 P.2d 86 (1992).

During the *Dodd* hearing the trial court relied on evaluations from defense expert Dr. Dorothy Lewis and state's expert Dr. G. Christian Harris. Both experts submitted written evaluations concluding Marshall had organic brain disease and was not competent to waive his appellate rights. In addition to the reports, the state agreed to include in the record of the *Dodd* hearing two exhibits from the original hearing to withdraw guilty plea: MRI scans of (1) a normal brain, and (2) Marshall's abnormal brain.

Dr. Harris, the state's expert, reviewed Marshall's records (most of which were compiled *prior* to the hearing to withdraw guilty plea) and found "a history of psychotic illness with suicidal ideation, past history of sexual abuse and substance abuse, violence and amnesia." Reply Br. of Appellant, App. B at 2. He opined, "this man has ample evidence of organic brain disease and functional psychosis. . . . His ability to 'know' and 'understand' what he is doing is narrowed, being influenced and tainted by these organic and functional impacts on his brain and mental function." *Id.*, App. B at 6. Dr. Harris also reviewed the opinion, evaluation, and methodology of the prior state's expert (Dr. Trowbridge) from the 1997 hearing to withdraw guilty plea. He criticized Trowbridge's evaluation, saying it seemed "mutually contradictory," and "would seemingly amount to ignoring Mr. Marshall's history of mental problems." *Id.*, App. B at 3.

Dr. Lewis, the same defense expert who testified at Marshall's hearing to withdraw guilty plea, also concluded Marshall did not understand the choice between life and death, saying: "Just as he was not competent to plead guilty when he did (note he shortly thereafter changed his mind) so he is not now competent to waive his appeal." *Id.*, App. C at 5.

Based on these evaluations the trial court found:

> Mr. Marshall suffers from an organic brain disease, brain atrophy and frontal lobe damage that affects his ability to plan ahead, conceptualize the future and make reasoned decisions and has a history of psychotic illness with suicidal ideation.
>
> . . . .
>
> Mr. Marshall's organic brain functions and functional psychosis currently influence his desire to commit suicide and these organic and functional impacts on his mental function narrow and influence his competency to know and understand what he is doing.
>
> . . . .
>
> The Defendant currently does not have the capacity to understand the choice between life and death and to knowingly

and intelligently waive any and all rights to his appeal.

Clerk's Papers at 1376-78.

Thus, the same trial court which initially found Marshall competent to enter a guilty plea subsequently determined he did not have the mental capacity to intelligently withdraw his appeal. The court reached this latter conclusion based on: (1) the original MRI taken before the hearing to withdraw guilty plea; (2) testimony of the state expert who heavily criticized Dr. Trowbridge's testimony[2] and who relied on records compiled prior to the hearing to withdraw guilty plea to reach his conclusion of organic brain disease; and (3) consistent testimony from the same defense expert which the trial court formerly discounted at the hearing to withdraw guilty plea. Moreover, the court concluded Marshall's organic brain disease, brain atrophy, and frontal lobe damage were all long-standing impairments, there being no evidence of any intervening change in condition *since* the hearing to withdraw the plea.

## II

## ANALYSIS

"Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran,* 509 U.S. 389, 402, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993). In a capital case there is a "special ' "need for reliability in the determination that death is the appropriate punishment" '." *Johnson v. Mississippi,* 486 U.S. 578, 584, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988) (quoting *Gardner v. Florida,* 430 U.S. 349, 363-64, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977) (quoting *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976))). Accordingly, the record must be critically scrutinized. *State v. Pirtle,* 127 Wn.2d 628, 664, 904 P.2d 245 (1995).

---

[2] Dr. Trowbridge is the only expert to conclude Marshall was competent at the time of his guilty plea.

■ The question here is whether the trial court's denial of Marshall's motion to withdraw the guilty plea was proper in light of the evidence calling Marshall's competency into question. In Washington "[n]o incompetent person shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues." RCW 10-.77.050. "Incompetency" exists where a person "lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect." RCW 10.77.010(14). According to the controlling statute, where there is reason to doubt a defendant's competency the trial court *must* appoint experts and order a formal competency hearing:

> Whenever a defendant has pleaded not guilty by reason of insanity, *or there is reason to doubt his or her competency*, the court on its own motion or on the motion of any party *shall* either appoint or request the secretary to designate at least two qualified experts or professional persons, one of whom shall be approved by the prosecuting attorney, to examine and report upon the mental condition of the defendant.

RCW 10.77.060(1)(a) (emphasis added). The statute mandates at least two court appointed experts *must* examine and prepare a report on the mental condition of the defendant, including:

(a) A description of the nature of the examination;

(b) A diagnosis of the mental condition of the defendant;

(c) If the defendant suffers from a mental disease or defect, or is developmentally disabled, an opinion as to competency;

(d) If the defendant has indicated his or her intention to rely on the defense of insanity pursuant to RCW 10.77.030, an opinion as to the defendant's sanity at the time of the act;

(e) When directed by the court, an opinion as to the capacity of the defendant to have a particular state of mind which is an element of the offense charged;

(f) An opinion as to whether the defendant should be evaluated by a county designated mental health professional under

chapter 71.05 RCW, and an opinion as to whether the defendant is a substantial danger to other persons, or presents a substantial likelihood of committing criminal acts jeopardizing public safety or security, unless kept under further control by the court or other persons or institutions.

RCW 10.77.060(3).

This competency hearing is mandatory whenever a legitimate question of competency arises:

> Procedures of the competency statute (chapter 10.77 RCW) are mandatory and not merely directory. *State v. Wicklund*, 96 Wn.2d 798, 805, 638 P.2d 1241 (1982). "Thus, once there is a reason to doubt a defendant's competency, the court must follow the statute to determine his or her competency to stand trial." *City of Seattle v. Gordon*, 39 Wn. App. 437, 441, 693 P.2d 741 (1985). Failure to observe procedures adequate to protect an accused's right not to be tried while incompetent to stand trial is a denial of due process. *State v. O'Neal*, 23 Wn. App. 899, 901, 600 P.2d 570 (1979) (citing *Drope [v. Missouri]*, 420 U.S. 162[, 95 S.Ct. 896, 43 L.Ed. 2d 103 (1975)]; *Pate [v. Robinson]*, 383 U.S. 375[, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966)]).

*In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 863, 16 P.3d 610 (2001).

While we opined the trial court in *Fleming* did not abuse its discretion by accepting the defendant's plea where there was no apparent basis to doubt his competency, we nevertheless granted a competency hearing due to ineffective assistance, concluding counsel failed to raise the issue despite an evaluation which called the defendant's competency into question. *Id*. at 866.

By contrast, here there was ample evidence before the trial court to call Marshall's competency into question at the hearing on motion to withdraw guilty plea. Undisputed evidence was presented indicating Marshall suffered from organic brain damage leading to long-standing brain dysfunction, with significant atrophy in the temporal and frontal lobes. There was testimony his MRI scan showed an unusual amount of brain abnormality for somebody who isn't "lying in a hospital." RP at 351. His ability to respond to stimulation and make decisions allegedly placed him in

the fourth percentile of the population, "way out in the abnormal range." RP at 357. Marshall scored in the average-to-low-average range on one intelligence test and in the first percentile on another. According to testimony, blood flow to different parts of Marshall's brain was restricted which allegedly affected his ability to think, reason, and control himself. Changes in his behavior were noticed corresponding to changes in his medication.

Testimony indicated Marshall suffered from bipolar mood disorder or manic depressive disorder. He was also diagnosed as a paranoid schizophrenic by the Pierce County jail health clinic seven weeks after the offense and a few weeks before he entered his plea. Over the next several weeks he suffered from a psychotic illness with paranoia accompanied by auditory hallucinations, which was intermittently treated by several medications—which he was not taking at the time of his plea. A defense expert concluded Marshall could not freely and voluntarily waive his constitutional right to enter a guilty plea because he was delusional and suffering from a psychotic depression at that time.

The court itself accepted Marshall had serious brain damage. During the hearing on motion to withdraw guilty plea the court said, "It is clear that he has impairment. It is clear that there is brain atrophy. But it is not clear that this has anything to do with whether or not his plea was competent or not competent." RP at 701. Heavily discounting the testimony of Marshall's neurologist, psychiatrist, and neuropsychologist, and choosing to rely instead on its own observations and on the observations of those who interacted with him at the time of the plea itself, the court found Marshall competent to change his plea to guilty without the benefit of a statutory competency hearing. This was error.

We will not reverse a trial court's order on a defense motion to withdraw guilty plea absent abuse of discretion. *State v. Olmsted*, 70 Wn.2d 116, 422 P.2d 312 (1966). However leave should be granted to withdraw a plea "whenever it appears that the withdrawal is necessary to

correct a manifest injustice." CrR 4.2(f). A manifest injustice exists where (1) the plea was not ratified by the defendant; (2) the plea was not voluntary; (3) effective counsel was denied; or (4) the plea agreement was not kept. *State v. Wakefield*, 130 Wn.2d 464, 925 P.2d 183 (1996). The defendant's claim that he was not competent to enter his plea is equivalent to claiming the plea was not voluntary. *State v. Osborne*, 102 Wn.2d 87, 98, 684 P.2d 683 (1984).

■ A person is not competent at the time of trial, sentencing, or punishment if he is incapable of properly appreciating his peril and of rationally assisting in his own defense. *State v. Harris*, 114 Wn.2d 419, 427-28, 789 P.2d 60 (1990).[3] The competency standard for standing trial is the same as the standard required for pleading guilty. *Godinez*, 509 U.S. at 399.

■ Whether a person is competent is a mixed question of law and fact. *Drope v. Missouri*, 420 U.S. 162, 174 n.10, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). In such a situation we independently apply the law to the facts. *See Clarke v. Shoreline Sch. Dist. No. 412*, 106 Wn.2d 102, 111, 720 P.2d 793 (1986).

Here, despite substantial evidence calling Marshall's competency into question, the trial court denied the motion to withdraw the guilty plea absent the mandatory competency hearing required by RCW 10.77.060. We hold that where a defendant moves to withdraw guilty plea with evidence the defendant was incompetent when the plea was made, the trial court must either grant the motion to withdraw guilty plea or convene a formal competency hearing required by RCW 10.77.060. *See Fleming*, 142 Wn.2d at 863. Here the court did neither.

---

[3] In *State v. Dodd*, 120 Wn.2d 1, 23, 838 P.2d 86 (1992) we held the test of whether a person is competent to waive his or her right to appeal in a capital case is consistent with the *Harris* test for determining whether a person is competent to stand trial. Here, the same trial court found Marshall *was* competent to enter a plea of guilty but *not* competent to withdraw his appeal, under the same competency standard based on essentially the same evidence.

Accordingly, we vacate Marshall's guilty plea and remand for further proceedings consistent with this opinion.[4]

ALEXANDER, C.J., and SMITH, JOHNSON, MADSEN, IRELAND, BRIDGE, CHAMBERS, and OWENS, JJ., concur.

[No. 70213-6.   En Banc.]
Argued May 8, 2001.      Decided July 19, 2001.

---

[4] We decline to address any of the other issues raised by Marshall or required by our mandatory review because it is unnecessary to reach them. Nor do we comment on the proportionality of imposing the death penalty under the facts of this case.