IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

2014 DEC -2 AM 9: 00
BY________
DEPUTY

| | | |
|---|---|---|
| STATE OF WASHINGTON, | | No. 44966-8-II |
| Respondent, | | |
| v. | | |
| WESTON GARRETT MILLER, | | UNPUBLISHED OPINION |
| Appellant. | | |

MELNICK, J. — Weston Miller appeals from his jury conviction for murder in the first degree. He asserts that insufficient evidence existed to find that he acted with premeditation and that a violation of his constitutional and fair trial rights occurred because some of the jurors could not see him where he sat at the counsel table. In his statement of additional grounds (SAG), Miller asserts that the trial court erred by excluding evidence of the amount of methamphetamine in the victim's system, evidence of the victim's bad character, and evidence of Miller's good character. He also argues the trial court erred by admitting evidence of a makeshift silencer that Miller possessed. We hold that there was sufficient evidence to convict Miller and that Miller's constitutional claims lack any support in the record. We also reject Miller's SAG claims. We affirm the trial court.

FACTS

Sara DeSalvo and David Carson lived together with Miller in his home. DeSalvo and Carson frequently argued, but Carson was never physically violent with DeSalvo. Other than DeSalvo, Carson rarely had disagreements with other people. DeSalvo testified that Carson had a soft-spoken and quiet demeanor.

Miller confronted DeSalvo about her fights with Carson. DeSalvo testified about the exchange that followed:

> [Miller] told me that—he goes, *"Why don't you just shoot [Carson]?"* I said, "What the hell you coming in here in the middle of my day talking shit like that?" I said, "Don't come in here and do that Weston. Are you crazy?" He goes, *"I'll do it for you."* I go, "You will do nothing for anybody."

Report of Proceedings (RP) (May 7, 2012) at 235 (emphasis added). The same day, Carson asked Miller, "Dude, did you say you were going to shoot me?" RP (May 7, 2012) at 236 (internal quotation marks omitted). Miller responded, "Yeah, so, it's not like we are friends." RP (May 7, 2012) at 236 (internal quotation marks omitted).

Two days later, DeSalvo and Carson were preparing to move out of Miller's house when they began to argue. At one point, DeSalvo hit her head on something and screamed for Miller. Miller knocked on the door and asked DeSalvo and Carson not to fight. Miller reiterated his request 15 to 20 minutes later.

Miller then went to his bedroom, opened a safe, and retrieved his gun. He loaded it, chambered a round, and concealed the gun in his pocket. He then knocked on DeSalvo and Carson's door and asked Carson to come out and talk. Carson complied and stepped out of the room. Carson was neither angry nor was he carrying any weapon. Carson complied with Miller's request that he close the door. DeSalvo then heard three rapid gunshots. She opened the door to see a puff of smoke and smell gunpowder. Carson, while holding his stomach, said "Dude, what did you do? You shot me." RP (May 7, 2013) at 253 (internal quotation marks omitted). Carson subsequently died from the shooting.

DeSalvo begged Miller not to kill her. She fled the house, screaming for help. Miller fled in his truck. After getting help, DeSalvo returned to the house. The police arrived shortly thereafter. DeSalvo did not touch Carson or move any items.

Upon his arrest, Miller cooperated with the police and gave a video statement. Miller admitted to shooting Carson. Miller said that he feared for DeSalvo because Carson was an unstable and dangerous person. Miller also claimed he feared for himself because DeSalvo and Carson were conspiring to kill him. Miller gave different accounts of what happened when he opened the door to DeSalvo and Carson's room. At first, Miller said that Carson was holding DeSalvo between himself and the door, and that he pushed DeSalvo out of the way to get inside and confront Carson. Later, Miller said that the moment he opened the door, Carson lunged at him with a knife, and Miller opened fire.

While there was at least one knife inside the room, none of the responding officers or paramedics located a knife in Carson's hands or near his body. The medical examiner did not find any defensive injuries on Carson's body. A ballistics expert concluded from the gunshot residue that Carson was shot from no more than five feet away.

## PROCEDURAL HISTORY

The State charged Miller with degree murder in the first degree with a firearm enhancement,[1] and four counts of unlawful possession of a firearm in the second degree.[2] Miller pleaded guilty to the firearm charges.

At trial, Miller argued that he shot Carson in self-defense. Miller did not testify. At one point in the trial, Miller's counsel complained that some of the jurors could not see the proceedings, which the trial court addressed by admonishing the jury:

> THE COURT: I have a belief that the jury is able to see and observe adequately the way they are sitting right now.
> [DEFENSE ATTORNEY]: Even though they say they can't.

---

[1] RCW 9A.32.030(1)(a); RCW 9.94A.825.

[2] RCW 9.41.040(2)(a)(i).

3

THE COURT: It isn't that they said they couldn't. One juror in particular the juror back in seat number 1 was complaining and we solved that by pushing the table forward. I'll address it.

(WHEREUPON THE JURY ENTERS THE COURTROOM.)

THE COURT: Good morning, ladies and gentlemen. Please be seated. Yesterday an issue came up with apparently some of the jurors having a hard time seeing everything that's going on in the courtroom. I've had the defense table moved up, which should help the line of sight issues. *If any of you have a problem seeing or hearing during the proceedings, let me know.* One alternative that I do have that I've done before in some of these trials is I have moved the alternates down in front and moved everybody over one seat, but I would rather not do that if I don't have to, because it makes it a little crowded in here when I do it that way, so I would prefer that we just stay where we are as long as everybody can see.

Also, it has come to my attention that counsel has had some difficulty being heard by the jurors. I've spoken to both attorneys and suggested that . . . they speak up.

RP (May 8, 2013) at 291-92 (emphasis added). The following day, Miller's counsel reiterated his objection, and the trial court reminded the jury to inform the court if they could not see or hear:

[DEFENSE ATTORNEY]: We still have a continuing problem of configuration of the jury. Just for purposes of the record, from where we sit we cannot see at least two or three of the jurors. They cannot see us.

THE COURT: Well, you don't know that. That's your speculation that they can't see you.

[DEFENSE ATTORNEY]: Well, I can't see them and I can't see through Officer Hughes and I can't see through the bailiff. They are in direct line, so once again I make my request to have the alternates be placed outside.

THE COURT: I inquired of the jury yesterday as to whether anybody was having a problem seeing or hearing with the defense table being where it is. None of the jurors indicated that they had a problem seeing or hearing the evidence, and here again the evidence generally comes from the witness stand. It may very well be that the jurors have an opportunity to view the parties at the counsel table, during the trial, but I'm not aware that being able to view the parties at counsel table is necessarily such a fundamental issue in a trial that I have to be concerned with the configuration of the jury.

The fact of the matter remains is that there are 14 chairs in the jury box in this particular courtroom and the 12 jurors are seated at one end and proceeding down the jury box with the alternates at the end and I'm not going to change that.

[DEFENSE ATTORNEY]: For the record.

THE COURT: Bring the jury in.

(WHEREUPON THE JURY ENTERS THE COURTROOM.)

4

THE COURT: Please be seated. Good morning. Ladies and gentlemen, once, again, the issue has been brought to the Court's attention that some of you may have some difficulty in seeing what's transpiring in the courtroom during the trial. As I mentioned yesterday, *if any of you during the course of the presentation of the trial have difficulty either seeing or hearing what's going on, and I'm not aware and I don't catch it, please by all means have a hand up and let me know if there's an issue,* because if there's not, I presume all of you have an opportunity to observe and listen and pay attention to what's going on in the courtroom.

RP (May 9, 2013) at 452-54 (emphasis added). At no point on the record does any juror indicate a problem seeing or hearing the proceedings.

The jury returned a guilty verdict of murder in the first degree with a firearm enhancement. Miller timely appealed.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

Miller argues that the State failed to prove premeditated intent to kill Carson. We hold that the State provided enough circumstantial evidence of premeditation to support Miller's conviction.

#### A. Standard of Review

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements beyond a reasonable doubt. *State v. Aten*, 130 Wn.2d 640, 666-67, 927 P.2d 210 (1996). Upon review of the sufficiency of the evidence, we draw all reasonable inferences from the evidence in the State's favor. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence is considered as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We will not review the jury's determination of the credibility of a witness or evidence.

*State v. Myers*, 133 Wn.2d 26, 38, 941 P.2d 1102 (1997). Rather, we treat all of the State's factual allegations and inferences as true. *Salinas*, 119 Wn.2d at 201.

B.     Premeditated Intent

Due process requires the State to prove all the necessary elements of the crime charged beyond a reasonable doubt. U.S. CONST. amend. XIV, § 1; CONST. art. 1, § 22; *In re Winship*, 397 U.S. 358, 362-65, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. Colquitt*, 133 Wn. App. 789, 796, 137 P.3d 892 (2006). As charged, murder in the first degree has two elements: "premeditated intent to cause the death of another person," and causing "the death of such person or of a third person." RCW 9A.32.030(1)(a). Here, only premeditated intent is at issue.

Premeditation is "the deliberate formation of and reflection upon the intent to take a human life" and involves "thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." *State v. Allen*, 159 Wn.2d 1, 7-8, 147 P.3d 581 (2006) (quoting *State v. Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999)) (internal quotation marks omitted); RCW 9A.32.020(1). Premeditation may be proven through circumstantial evidence so long as "the inferences drawn by the jury are reasonable and the evidence supporting the jury's verdict is substantial." *State v. Bingham*, 105 Wn.2d 820, 824, 719 P.2d 109 (1986).

A wide range of proven facts may support an inference of premeditation. *State v. Gentry*, 125 Wn.2d 570, 598, 888 P.2d 1105 (1995). Generally, "any planning activity by the defendant prior to the murder, which relates to the manner in which the murder was accomplished, can be

evidence of premeditation." *State v. Lindamood*, 39 Wn. App. 517, 521, 693 P.2d 753 (1985). For example, a defendant's affirmative act of retrieving a weapon from elsewhere may allow the fact finder to infer premeditation. *State v. Ortiz*, 119 Wn.2d 294, 312-13, 831 P.2d 1060 (1992); *State v. Commodore*, 38 Wn. App. 244, 248, 684 P.2d 1364 (1984).

Here, the State presented substantial circumstantial evidence that Miller formed a premeditated intent to kill Carson. Two days before shooting Carson, Miller stated he would shoot Carson. On the day of the shooting, Miller went to his room, retrieved his gun from a safe, loaded the gun, and concealed it. Miller specifically asked Carson to exit the room and talk. Miller then shot Carson. Viewed in the light most favorable to the prosecution, the evidence permitted the jury to find premeditation beyond a reasonable doubt. We hold that the State's evidence was sufficient to convict Miller of murder in the first degree, and we affirm the trial court.

II.   JURY OBSTRUCTION

Miller argues that his right to confrontation,[3] his right to a fair and public trial,[4] and, by analogy, his right to assist his attorney[5] were violated because he and the jury could not see each other. We hold that the record fails to establish that the jurors could not see or observe Miller, and we affirm the trial court.

The trial court is generally in the best position to perceive and structure its own proceedings, meaning that the trial court has broad discretion to make trial management decisions. *State v. Dye*, 178 Wn.2d 541, 547-48, 309 P.3d 1192 (2013). Courtroom procedures

---

[3] U.S. CONST. amend. VI.

[4] U.S. CONST. amend. VI; WASH. CONST. art. I, §§ 10, 21, 22.

[5] *State v. Marshall*, 144 Wn.2d 266, 277, 27 P.3d 192 (2001), *overruled on other grounds by State v. Sisouvanh*, 175 Wn.2d 607, 290 P.3d 942 (2012).

are reviewed for abuse of discretion, even if a court ruling allegedly violates fair trial rights. *Dye,* 178 Wn.2d at 548. Even if we disagree with the trial court, reversal is inappropriate unless the court's decision is "manifestly unreasonable or based on untenable grounds or untenable reasons." *Dye,* 178 Wn.2d at 548 (quoting *In re Marriage of Littlefield,* 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)).

By his own admission, Miller has no authority for his theory that a defendant has a constitutional right to be seen at the counsel table or to observe the jury during trial. Nor could we find any such authority after a nationwide search of federal and state authority. However, even if Miller had support for his legal theory, the facts do not support his argument. "It is the responsibility of the party alleging error to create a record of that error." *Dye,* 178 Wn.2d at 556. Here, the record fails to establish that the jury could not see Miller. On two separate occasions, the trial court inquired whether the jurors were having difficulty seeing or hearing the proceedings, and instructed them to tell the court if they were having such difficulty. No juror did so. The trial court did not abuse its discretion by refusing to credit Miller's speculation that the jury was unable to see. We affirm the trial court.

III. SAG GROUNDS

Miller raises several issues in his SAG. He argues that he shot Carson in lawful self-defense. Miller also raises evidentiary issues in his SAG relating to (1) toxicology evidence; (2) evidence of Carson's bad character; (3) evidence of Miller's good character; and (4) admission of a silencer. Finally, Miller reiterates his insufficient evidence claim, which we have disposed of above and will not address further.

A.     Standard of Review

We review a trial court's evidentiary rulings for abuse of discretion. *State v. McDonald*, 138 Wn.2d 680, 693, 981 P.2d 443 (1999). The same standard applies when we review the admissibility of expert evidence under ER 702. *State v. Copeland*, 130 Wn.2d 244, 270-71, 922 P.2d 1304 (1996). A self-defense claim uses a separate standard, which is discussed below.

B.     Self-Defense

Miller argues that he exercised lawful self-defense when he shot Carson. We disagree.

The nature of Miller's argument is not quite clear from the face of his SAG; he merely recites the rule of *State v. Allery*, 101 Wn.2d 591, 682 P.2d 312 (1984), without applying specific facts or explaining how his trial contravened this rule. In any case, a careful review of the instructions and the facts reveals no error.

"To be entitled to a jury instruction on self-defense, the defendant must produce some evidence demonstrating self-defense; however, once the defendant produces some evidence, the burden shifts to the prosecution to prove the absence of self-defense beyond a reasonable doubt." *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). Furthermore, a self-defense instruction must "more than adequately convey the law of self-defense." *State v. LeFaber*, 128 Wn.2d 896, 900, 913 P.2d 369 (1996), *abrogated on other grounds by State v. O'Hara*, 167 Wn.2d 91, 217 P.3d 756 (2009).

Here, the jury was instructed on self-defense. The self-defense instruction was patterned on 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.02, at 234 (3d ed. 2008),[6] which we have held is the appropriate self-defense instruction where the defendant uses a deadly weapon to exert deadly force. *State v. Ferguson*, 131 Wn. App. 855, 860, 129 P.3d 856 (2006). The jury instruction more than adequately conveyed the law of self-defense. Assuming Miller intended to challenge the self-defense instruction, his challenge fails.

We also hold that the evidence was sufficient for the jury to determine that Miller was not acting in self-defense. *See State v. McCreven*, 170 Wn. App. 444, 481, 284 P.3d 793 (2012). As discussed above, the State's evidence was sufficient to establish that Miller shot Carson with premeditation. In contrast, no evidence supported Miller's theory of self-defense, other than

---

[6] It is a defense to a charge of [murder] [manslaughter] that the homicide was justifiable as defined in this instruction.

Homicide is justifiable when committed in the lawful defense of [the slayer] [the slayer's [husband] [wife] [registered domestic partner] [parent] [child] [brother] [sister]] [any person in the slayer's presence or company] when:

1) the slayer reasonably believed that the person slain [or others whom the defendant reasonably believed were acting in concert with the person slain] intended [to commit a felony] [to inflict death or great personal injury];

2) the slayer reasonably believed that there was imminent danger of such harm being accomplished; and

3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to [him] [her], at the time of [and prior to] the incident.

The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

Emphasis omitted.

Miller's own bare assertions. No knife was found in the vicinity of Carson's body. Although he was shot at very close range, no injuries were found on Carson's body to indicate a struggle. Finally, a rational jury could have chosen not to credit Miller's account of the shooting because he provided inconsistent stories to the police. In light of these facts, a rational jury could have found beyond a reasonable doubt that Miller did not act in self-defense.

C.     Toxicology Evidence

Miller argues that the trial court should have admitted evidence of the levels of methamphetamines in Carson's blood at the time of his death. We disagree.

An expert witness may testify when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." ER 702. Here, the trial court found that the toxicology evidence would not assist the jury because the toxicologist did not know "the parameters of the actual deceased person" and could not speak to how the methamphetamines might have affected Carson's behavior. RP (May 9, 2013) at 502. We agree. Disconnected from evidence of how Carson was actually acting toward Miller, the evidence of Carson's toxicology was more likely to distract the jury than to help them determine the legitimacy of Miller's self-defense claim. Accordingly, the trial court did not abuse its discretion when it excluded the toxicology evidence.

D.     Victim's Character Evidence

Miller argues that the trial court should have admitted "the police's stat[e]ments that 'David Carson was very hardcore; he had a very violent record and most people are scared of him,'" as well as evidence of Carson's history of violent and drug-related crimes. SAG at 2. We disagree.

In a self-defense case, the victim's reputation for violence may be admissible *if* the defendant had knowledge of the victim's reputation at the time of the slaying. *State v. Callahan*, 87 Wn. App. 925, 934, 943 P.2d 676 (1997) (citing *State v. Cloud*, 7 Wn. App. 211, 217, 498 P.2d 907 (1972)). Here, Miller presented no evidence that he knew about Carson's criminal history or general reputation for violence at the time that he shot Carson. Therefore, it was not admissible as evidence that Miller reasonably feared Carson would harm him. *See Callahan*, 87 Wn. App. at 934; *State v. Hixson*, 94 Wn. App. 862, 867, 973 P.2d 496 (1999).

Evidence of the victim's violent character may also be relevant to show that the victim was the aggressor in a self-defense scenario. *Callahan*, 87 Wn. App. at 934. But reputation evidence must be based on witness's personal knowledge of victim's reputation in a relevant community during a relevant time period. *Callahan*, 87 Wn. App. at 934 (citing *State v. Riggs*, 32 Wn.2d 281, 284, 201 P.2d 219 (1949)). The police cannot testify to a victim's community reputation based on the victim's past encounters with the criminal justice system. *Callahan*, 87 Wn. App. at 935 (citing *State v. Lord*, 117 Wn.2d 829, 874, 822 P.2d 177 (1991)). Here, the proffered character evidence derives from "the police's stat[e]ments." SAG at 2. The trial court did not abuse its discretion in excluding this non-neutral reputation evidence.

E.     Defendant's Character Evidence

Miller argues that his "impressive work history, having been a home owner for ten years, and no felony record should have been presented to the jury to esstablish [sic] my character to show them how sucessful [sic] and independent for someone my age." SAG at 2. We disagree.

Evidence which is not relevant is not admissible. ER 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER at 401.

The fact that Miller was successful was not relevant. Because Miller admitted that he shot Carson, the only questions of fact were whether Miller acted with premeditation, and whether he acted in lawful self-defense. According to the jury instructions, Miller could claim self-defense only if he reasonably believed that Carson intended to inflict death or great personal injury, if he reasonably believed he was in imminent danger of such harm being accomplished, and if he employed reasonable force. Miller's homeownership, work history, and absence of a felony record did not make it more or less likely that Miller premeditated the shooting, that he reasonably feared Carson, or that the force he exercised was reasonable. The trial court did not abuse its discretion by excluding evidence of Miller's good character.

F.     Silencer

Miller argues that the trial court erred by admitting evidence of a makeshift silencer. We disagree.

At some point before the shooting, Miller showed DeSalvo and Carson a homemade silencer he had made with napkins and a plastic bottle, and stated that "[t]he good thing about it all you have to do when you are done you burn it and the evidence is gone." RP (May 7, 2013) at 233 (internal quotation marks omitted). The police found a water bottle stuffed with toilet paper in Miller's home, and the trial court admitted two photographs of the bottle.

Miller argues that the bottle was not properly authenticated. To authenticate a photograph, the proponent must put forward a witness "able to give some indication as to when, where, and under what circumstances the photograph was taken, and that the photograph accurately portrays the subject illustrated." *State v. Newman*, 4 Wn. App. 588, 593, 484 P.2d 473 (1971). The witness does not necessarily need to be the photographer. *Newman*, 4 Wn. App. at 593. . Here, Officer Rick Hughes testified to the identity of the bottle, and the

13

circumstances under which the picture was taken; that is, during the police search of Miller's home. This was sufficient authentication, and the trial court did not abuse its discretion by admitting the photographs into evidence.

Miller also argues that the bottle was not relevant because the makeshift silencer was not used in the shooting. However, the bottle corroborated DeSalvo's testimony that Miller discussed homemade silencers with her. In turn, this conversation indicated that Miller was interested in shooting someone without leaving behind evidence. Accordingly, the bottle was relevant to proving Miller's premeditated intent. *See* ER 701. The trial court did not abuse its discretion by admitting the photographs of the makeshift silencer into evidence.

We affirm the conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Jonanson, C.J.

Bj___en, J.