**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

STATE OF WASHINGTON, )
                                     )
              Respondent, )
                                     )
             v. )
                                     )
MICHELLE C. MARTINEZ, )
                                     )
              Appellant. )
_____ )

DIVISION ONE

No. 80500-2-I

UNPUBLISHED OPINION

DWYER, J. — Michelle Martinez appeals from the trial court's order denying her motion to withdraw her guilty plea to controlled substances homicide. Martinez contends that her plea was not voluntary because there was an insufficient factual basis to support her guilt. We conclude to the contrary. Accordingly, we affirm.

I

On May 11, 2018, the Swinomish Police Department responded to a reported drug overdose and found Ida Sylvester unconscious on her bedroom floor. While en route to the hospital, Sylvester died.

The day before her death, Sylvester drove three individuals (identified in the probable cause affidavit as Witness 1, Witness 2, and Witness 3) to Martinez's house to purchase Percocet.[1] Text messages between Martinez and

---

[1] The facts contained herein are based on the probable cause affidavit because it provided the factual basis for the trial court's decision to accept Martinez's guilty plea. Because the probable cause affidavit does not state the witnesses' names, we refer to them as Witness 1, Witness 2, and Witness 3.

Witness 3 suggest that Sylvester, Witness 1, Witness 2, and Witness 3 went to Martinez's house to purchase pills several times that day. While the probable cause affidavit does not directly quote the text messages between Martinez and Witness 3, the affidavit suggests that both Martinez and Witness 3 used the pronoun "they" as if acknowledging that more than one buyer was involved in the transactions. ("[Witness 3] can then be seen texting MARTINEZ that *they* need two [pills]"; "[Witness 3] text[s] MARTINEZ stating that *they* are there"; "MARTINEZ responds by telling [Witness 3] to let her know when *they* arrive"; "[Witness 3] texts MARTINEZ letting her know that *they* have arrived." (emphases added)).

Throughout the day, Martinez sold Witness 3 up to nine 30mg Percocet pills. On at least one occasion, Sylvester waited in the car as Witness 3 purchased two pills from Martinez. Witness 1 stated that Sylvester waited in the car because Martinez did not like Sylvester. Furthermore, Witness 3 told police that Witness 3 would normally purchase drugs for the entire group (Sylvester, Witness 1, Witness 2, and Witness 3).

Calvin Edwards—the individual who reported Sylvester's overdose to the police—stated that he had been purchasing Percocet from Martinez for the last two years. On prior occasions, Edwards had purchased pills from Martinez for Sylvester. According to Edwards, Martinez was aware that, on these occasions, he was purchasing pills for both himself and Sylvester. Martinez did not want Sylvester to come into her house, so Sylvester would stay in the car during the transactions. Although Martinez did not want Sylvester in her house, Sylvester's

cell phone contained text messages between Sylvester and Martinez regarding drug transactions on previous occasions.

Hours after Edwards reported Sylvester's overdose, he telephoned Martinez. The probable cause affidavit does not describe the content of this conversation. However, shortly after speaking with Edwards, Martinez texted another individual, stating that a woman had died from drugs sold by Martinez and that the pills were causing people to throw up blood. Martinez warned this individual that "he is going to lose a lot of clients from the store because of [a] change [in pills that he] made." The following day, Martinez texted another individual, warning, "Don't take the dark blue one," and "Just bring it back."

Prior to Sylvester's overdose, the police had received information about drug activity conducted at Martinez's address by a female who was referenced by the nickname "Mika." Three individuals—an anonymous caller, Witness 1, and Witness 2—all told the police that Martinez goes by the nickname "Mika." In addition, a search of Martinez's cell phone revealed that "just about everyone [including] MARTINEZ herself identifies her as Mika."

At the time of her arrest, Martinez stated that she does not go by "Mika" and that nobody called her that. She also told officers that she knew nothing about pills being sold at her house. According to Martinez, she had only met Sylvester and Witness 3 on one occasion when they stopped by the house for "spiritual readings and baths."

The State charged Martinez with seven controlled substances offenses. Martinez pled guilty to three counts: controlled substances homicide, possession

3

with intent to manufacture or deliver a controlled substance, and conspiracy to deliver a controlled substance. In entering her plea, rather than making a statement detailing her guilt in her own words, Martinez "agree[d] that the court may review the police reports and/or a statement of probable cause supplied by the prosecution to establish a factual basis for the plea." The trial court accepted Martinez's guilty plea to all three counts.

Prior to sentencing, however, Martinez moved to withdraw her guilty plea to the controlled substances homicide charge, asserting that there was an insufficient factual basis for her plea. The trial court denied Martinez's motion, reasoning that the probable cause affidavit contained sufficient facts to support her guilt of controlled substances homicide. Martinez appeals.

II

Martinez contends that her guilty plea to controlled substances homicide was not voluntary because there was an insufficient factual basis to support the plea. Specifically, Martinez asserts that the probable cause affidavit did not recite facts sufficient to establish that she delivered drugs to Sylvester. We disagree.

A

We review the denial of a motion to withdraw a guilty plea for abuse of discretion. State v. Marshall, 144 Wn.2d 266, 280, 27 P.3d 192 (2001). A guilty plea may be withdrawn when necessary to correct a manifest injustice. CrR 4.2(f). A manifest injustice exists when the plea was not voluntary. Marshall, 144 Wn.2d at 281. To ensure that a plea is voluntary, "[t]he court shall not enter

a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea." CrR 4.2(d). In its determination of "whether a factual basis exists for a plea, the trial court need not be convinced beyond a reasonable doubt that the defendant is in fact guilty." State v. Saas, 118 Wn.2d 37, 43, 820 P.2d 505 (1991). Instead, "a factual basis exists if there is sufficient evidence for a jury to conclude that the defendant is guilty." Saas, 118 Wn.2d at 43.

We employ the same test for reviewing the factual basis of a plea as we do for reviewing the sufficiency of the evidence to support a verdict. When reviewing the sufficiency of the evidence for a conviction, we view the evidence in the light most favorable to the State, draw all reasonable inferences from the evidence in the State's favor, and interpret the evidence most strongly against the defendant. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth both of the State's evidence and of all reasonable inferences from the evidence. Salinas, 119 Wn.2d at 201. We then determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).[2]

B

Under the Uniform Controlled Substances Act, chapter 69.50 RCW:

A person who unlawfully delivers a controlled substance in violation of RCW 69.50.401(2) (a), (b), or (c) which controlled substance is subsequently used by the person to whom it was delivered,

---

[2] This is an objective standard. Accordingly, the parties' quibbling over the sufficiency of the trial court's findings of fact is of no moment. If *any* rational trier of fact could have found the facts sufficient, the standard is met—regardless of what a particular fact finder might have found or not found.

resulting in the death of the user, is guilty of controlled substances homicide.

RCW 69.50.415(1). Further, "'[d]eliver' or 'delivery' means the actual or constructive transfer from one person to another of a substance, whether or not there is an agency relationship." RCW 69.50.101(i).

In State v. Campbell, we cited a dictionary for the common understanding of "transfer," interpreting it to mean "'to carry or take from one person or place to another'" or, more broadly, "'to cause to pass from one person or thing to another.'" 59 Wn. App. 61, 64, 795 P.2d 750 (1990) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2426-27 (1971)). Similarly, in State v. Morris, we cited a legal dictionary's definition of "transfer," which stated: "'To convey or remove from one place, person, etc., to another; pass or hand over from one to another; . . . sell or give.'" 77 Wn. App. 948, 951, 896 P.2d 81 (1995) (quoting BLACK'S LAW DICTIONARY (4th ed. rev. (1968)). We have also noted that "the ordinary meaning of the word transfer includes constructive transfers." Campbell, 59 Wn. App. at 64.

In addition, we have in the past considered other states' interpretations of the term "constructive transfer" when those courts were construing their own versions of the Uniform Controlled Substances Act. Notably, we approved of a Texas appellate court's recitation of one mode of constructive transfer: "'[T]he transfer of a controlled substance either belonging to the defendant or under his direct or indirect control, by some other person or manner at the instance or direction of the defendant.'" Campbell, 59 Wn. App. at 63 (quoting Davila v. State, 664 S.W.2d 722, 724 (Tex.Crim.App. 1984)).

6

In State v. Ramirez, 62 Wn. App. 301, 308, 814 P.2d 227 (1991), we explained that, "[b]y its use of the term 'deliver,' the Uniform [Controlled Substances] Act . . . criminalize[s] *participation* in the transfer of unlawful drugs, regardless of whether the participation benefited the buyer or the seller." Ramirez, 62 Wn. App. at 308. Therefore, "when the Legislature defined a delivery as a 'transfer', it necessarily included as 'deliverers' any persons who intentionally participated in bringing about the drug transaction." Ramirez, 62 Wn. App. at 309.

When an intermediary is involved in the sale of drugs, the intermediary does not need to serve as an agent for the transferor to be criminally liable. See RCW 69.50.101(i) ("'Deliver' or 'delivery' means the actual or constructive transfer from one person to another of a substance, *whether or not there is an agency relationship*." (emphasis added)). In other words, the transferor does not have to direct or control the intermediary, as agency would require. See Durias v. Boswell, 58 Wn. App. 100, 104, 791 P.2d 282 (1990) ("An agency relationship exists when one agrees to act for another under the latter's direction and control.").

As we did in Campbell, we again look to how other states have interpreted "constructive transfer" in construing their versions of the Uniform Controlled Substances Act. In Daniels v. State, 754 S.W.2d 214, 221 (Tex.Crim.App.1988), the Texas Court of Criminal Appeals clarified the requirements for a constructive transfer, stating that a "constructive transfer requires the transferor at least be aware of the existence of the ultimate transferee before delivery." To clarify:

> This does not mean that the transferor need know the identity of or be acquainted with the ultimate recipient. It only requires that when the State alleges constructive transfer to an alleged ultimate recipient that the accused must have contemplated that his initial transfer would not be the final transaction in the chain of distribution.

Daniels, 754 S.W.2d at 221.

This formulation is consistent with our own case law. Indeed, in Campbell, we held that Campbell was properly convicted of delivering a controlled substance by virtue of having sold cocaine to an undercover police officer through an intermediary. Campbell, 59 Wn. App. at 62. We held that "[t]he evidence shows that Campbell directed a constructive transfer of cocaine." Campbell, 59 Wn. App. at 63. Stated differently, the State proved that Campbell necessarily knew that the intermediary was to deliver the cocaine to some other person. It did not matter that Campbell was unaware of the ultimate purchaser's true name or employment as a police officer. Campbell, 59 Wn. App. at 63-64.

Thus, a person can transfer a substance by "'caus[ing it] to pass from one person or thing to another.'" Campbell, 59 Wn. App. at 64 (quoting WEBSTER'S, supra, at 2426-27). This transfer may be facilitated by an intermediary, even when the intermediary is not acting as an agent. RCW 69.50.101(i). What is required is that the existence—but not the identity—of an ultimate recipient or recipients be known. Daniels, 754 S.W.2d at 221; see, e.g., Campbell, 59 Wn. App. at 62.

C

The probable cause affidavit states sufficient facts to support Martinez's plea of guilty to controlled substances homicide because a reasonable trier of

fact could infer that Martinez caused pills to transfer to Sylvester by way of an intermediary. The text messages between Martinez and Witness 3 alone suggest that Martinez knew that Witness 3 was not the only transferee in the drug transactions on May 10, 2018, but, rather, was acting, at least in part, as an intermediary. In particular, the probable cause affidavit's description of the text messages uses the pronoun "they" as if both Martinez and Witness 3 were stating that more than one transferee was involved in the transactions. ("[Witness 3] can then be seen texting MARTINEZ that *they* need two [pills]"; "[Witness 3] text[s] MARTINEZ stating that *they* are there"; "MARTINEZ responds by telling [Witness 3] to let her know when *they* arrive"; "[Witness 3] texts MARTINEZ letting her know that *they* have arrived." (emphases added)).

These statements suggest that Martinez knew that Witness 3 was purchasing pills for not only personal use but, also, for the use of at least one other person. As explained above, a constructive transfer requires the transferor be aware of the existence of an ultimate transferee before delivery. Daniels, 754 S.W.2d at 221.

Additionally, the probable cause affidavit states that Martinez sold Witness 3 up to nine 30mg Percocet pills over the course of the day. A reasonable trier of fact could infer that nine 30mg pills is more than any individual would consume in one day and, therefore, Martinez knew that Witness 3 was acting as an intermediary for another transferee or transferees.

Moreover, Martinez's prior course of dealing with Sylvester suggests that Martinez knew that the pills Witness 3 was purchasing were, at least in part, for

Sylvester. Sylvester's cell phone contained text messages she exchanged with Martinez regarding pill transactions on previous occasions. Both Witness 1 and Edwards stated that Martinez did not want Sylvester to come into her house during such transactions, so Sylvester would wait in the car while someone else physically purchased the pills. According to Edwards, when he had purchased pills from Martinez, Martinez was aware that he was purchasing pills for both himself and Sylvester. Additionally, the probable cause affidavit states that Witness 3 would normally purchase drugs from Martinez for the entire group (Sylvester, Witness 1, Witness 2, and Witness 3), suggesting that Witness 3 had done so on prior occasions.

Given this prior course of dealing, a reasonable trier of fact could infer that Martinez knew that Witness 3 was acting as an intermediary for Sylvester as to some or all of the transactions on May 10, 2018. While a transferor does not need to know the identity of a transferee for a constructive transfer to occur, such an inference nonetheless strongly reinforces the conclusion that Martinez delivered pills to Sylvester. See Daniels, 754 S.W.2d at 221 (stating that the transferor to a constructive transfer does not need to know the identity of the transferee).

Finally, Martinez's actions upon learning of Sylvester's overdose could lead a reasonable trier of fact to infer that, at the time Martinez sold drugs to Witness 3, she knew that Sylvester was a transferee. Hours after Edwards reported Sylvester's overdose, he called Martinez. The probable cause affidavit does not describe the content of this conversation. But shortly after speaking to

Edwards, Martinez texted another individual, stating that a woman had died from drugs sold by Martinez and that the pills were causing people to throw up blood. She warned this individual that "he is going to lose a lot of clients from the store because of [a] change [in pills that he] made." The following day, Martinez texted another individual, warning, "Don't take the dark blue one," and "Just bring it back."

These messages demonstrate Martinez's knowledge that Sylvester died from drugs sold by Martinez. A rationale trier of fact could conclude that, after speaking to Edwards, Martinez contacted her supplier to warn him that the new, dark blue pills supplied by him make people sick or die. A rationale trier of fact could also conclude that Martinez then warned a customer not to take a dark blue pill.

Competing inferences could be drawn from the text messages sent by Martinez. On the one hand, these messages could be perceived to show that Martinez had just learned from Edwards that Sylvester was a transferee to the May 10 transactions. On the other hand, these messages could be perceived to indicate that Martinez was already aware that Sylvester had purchased pills from her on May 10, and she had just learned that those pills killed Sylvester. However, our charge is to credit the inference in favor of the State. Salinas, 119 Wn.2d at 201. We do so here. Accordingly, a reasonable trier of fact could infer that, at the time of the transactions on May 10, Martinez knew that Witness 3 was purchasing pills on Sylvester's behalf.

From these facts, a reasonable trier of fact could infer that Martinez delivered to Sylvester the drugs that ultimately lead to her demise. Hence, the probable cause affidavit contained sufficient facts to support Martinez's guilty plea. Therefore, Martinez's guilty plea was properly deemed to be voluntary. The trial court did not abuse its discretion by denying Martinez's motion to withdraw her plea.

Affirmed.

Dwyer, J.

We concur:

Andrus, A.C.J.          Appelwick, J.