IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                        Respondent,<br><br>      v.<br><br>SEAN ALAN KANE,<br><br>                        Appellant. | No. 86684-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BUI, J. — Sean Kane appeals his convictions of multiple offenses arising from prohibited contact with his estranged wife, Aizhan Kane.[1] Before trial, the court found Kane incompetent, and after his competency was restored, he waived counsel and represented himself. On appeal, Kane argues the trial court erred by not ordering a renewed competency evaluation based on his behavior at trial and by denying his post-verdict motion for a retrospective hearing. Kane also argues reversal is required because the trial court failed to adequately investigate a juror's concerns about the presiding juror and because insufficient evidence supports his conviction of interfering with domestic violence (DV) reporting.

We agree insufficient evidence supports the interfering with DV reporting conviction. Accordingly, we reverse that conviction and remand to the trial court to vacate it. Otherwise, we affirm.

---

[1] We refer to Aizhan by her first name for clarity. We mean no disrespect.

FACTS

On August 24, 2022, the King County Superior Court entered a one-year DV protection order (DVPO) protecting Aizhan from Kane. Kane was not formally served with the DVPO until November 8, 2022. Meanwhile, according to Aizhan's trial testimony, she was driving with her sister and children on October 7, 2022, when she encountered Kane at an intersection in Bellevue. According to Aizhan, Kane approached her car with what appeared to be a rock in his hand. Aizhan testified she told Kane to go away and she had a protection order. Aizhan called 911, and officer Adam Berns, who responded, later testified that when he located Kane, he informed him of the DVPO and that it was illegal for him to contact Aizhan. Berns did not arrest Kane because he "had no reason to believe up to that point that [Kane] had any knowledge of the [DVPO]." Aizhan testified she took a photograph of Kane during this car incident.

Aizhan called 911 again on October 27, 2022, to report Kane had attacked her in her apartment before fleeing on foot. Aizhan would later testify she was home with her sister and parents when Kane knocked on the door, pushed his way through when someone answered it, grabbed Aizhan's hand, and dragged her toward the bedroom. She testified her body collided with toys on the floor and she eventually hit a door frame, causing injuries. She also testified her sister tried to call 911, but Kane grabbed her sister's wrist. Responding officers took photos of Aizhan's injuries, as did Dr. Adriana Rosales, who treated Aizhan at an urgent care clinic later that day.

On November 18, 2022, the State charged Kane by information with one

2

count of burglary in the first degree – DV (Count 1), one count of DV felony violation of a court order (Count 2), and one count of interfering with DV reporting (Count 3) based on the October 27 incident. The State planned to use the October 7 car incident to show Kane knew about the DVPO on October 27 even though he had not yet been served. Later, the State added two counts of DV misdemeanor violation of a court order (Counts 4 and 5) based on e-mails Kane allegedly sent to Aizhan. It would amend the information multiple times to narrow the date ranges for the conduct charged in those additional counts.

On January 10, 2023, Kane, through counsel, requested a competency evaluation and release pending trial. The trial court denied release and ordered an evaluation. It later found Kane incompetent, relying on a January 24, 2023, report from Jolene Simpson, Ph.D., who opined that Kane's "most impairing issues in his presentation were his inability to communicate in a reasoned or logical manner without digressing to grandiose, paranoid, and persecutory themes." Simpson also noted Kane's "[t]angential and derailed thought processes." The trial court ordered 90 days of competency restoration, and on June 6, it found Kane competent, relying on a May 30, 2023, report from Kayla Carson, Psy.D.

On June 30, the trial court granted Kane's motion to waive his right to counsel and proceed pro se, and on July 25, 2023, the court called Kane's case for trial. Kane's defense theory was that he was not the man Aizhan saw during the October 7 car incident and that Aizhan fabricated the evidence against him to gain an advantage in their pending marriage dissolution. He also posited that the

3

e-mails that were the basis for Counts 4 and 5 were not sent by him and could have been generated by an artificial intelligence (AI) enabled "bot."

During motions in limine, Kane informed the trial court he believed he may have "gone on a date or hung out at [a] music festival with" one of the prosecutors when he lived on Capitol Hill, and it was "really distracting." The prosecutor responded he "d[id] not believe [he knew] Mr. Kane," had not gone on a date with him, and "rarely f[ound him]self at music festivals." He conceded it was "possible that [he had] seen Mr. Kane in Capitol Hill" given that he also lived there but "personally ha[d] no recollection of seeing Mr. Kane at any prior point prior to [his] professional involvement" in Kane's case. The trial court asked Kane, "[D]oes that put your mind at ease," and Kane responded, "Yes."

Jury selection took place over Zoom.[2] Kane began by telling the panel it was his "first time doing this" so his "mind's wandered a little bit" and he was "trying to maintain focus." Kane then asked,

> Does anybody in the jury have any experience with personal hardship? I'm trying to do open-ended questions like the prosecutor, but now it's hurting my neck, so – oh, are people comfortable with the fact that presumed innocent means presumed innocent, not presumed guilty?

After a prospective juror responded affirmatively, Kane asked whether the panel was "aware that the prosecution can file pretrial motions that can prevent you from making logical arguments in your own defense," and when a prospective juror asked Kane to clarify, he began, "So basically what's happened here . . . ." The trial court interjected, muted the courtroom, and explained that Kane could

---

[2] "Zoom" is a cloud-based videoconferencing software platform.

4

not ask about anything "particular to the facts of the case or the procedure that has occurred thus far." When the panel was back online, Kane explained, "I've been redirected," and asked, "Are you aware that when you don't have money you don't have access to lawyers?" The State objected, the trial court sustained the objection, and Kane asked, "Are you familiar with experiments such as the Stanford Psychology Experiment where people, when given positions of power, become gradually more and more cruel to the individuals they have power over?" The State objected again. The trial court then muted the courtroom and explained it was "inappropriate to make suggestions . . . that something nefarious is happening" and directed him to ask "open-ended questions so that you can determine whether these folks can be fair in your particular case."

Thereafter, Kane asked the panel some questions related to his defense theory. For example, he asked whether any prospective jurors had experienced someone saying something about them that was not true, and whether any were "familiar with divorce cases being confusing and challenging." He also asked whether anyone believed evidence could be misrepresented and whether they believed protection orders "have to be served to be valid." And, he asked, "When we're on a jury trying to decide over whether or not a crime was committed, do people believe it has to fit exactly within the definition of the written law?"

During the State's next round of questioning, Kane interjected, the court muted the courtroom, and Kane asked, "Can we get a new prosecutor? I can't stand his voice, number one. Number two, I'm certain we met in Capitol Hill before. He's got a personal bias against me. We definitely met online. He's got a

personal bias against me. He's going to make my head blow up." The trial court confirmed Kane had taken some medication (aspirin), then admonished him not to speak while the prosecutor asked questions, indicating, "You'll have your chance." Kane responded, "All right," and the prosecutor continued with his questioning.

When it was Kane's turn again, he asked one of the prospective jurors whether a person's employment history would be relevant to that person's credibility, and then whether the prospective juror had "ever experienced the look-alike doppelganger thing where people come up to you and they say, where have I seen you before, and you've never seen that person a day in your life?" After receiving an affirmative response, Kane turned to another prospective juror and asked whether their prior work experience would bias them. That prospective juror responded no, and then Kane asked the panel, "[W]ould anybody be willing to understand that sometimes you go to the police station and you ask them if there are papers?" The State objected, and after muting the courtroom, the trial court asked Kane what his full question was. Kane responded,

> I'm trying to frame this so that it means that in fact, even though it wasn't me, that's the thing is I have – oh, I played Michael's game. That's what I'm saying. So it's getting into the alternative hypothesis theory and on alternative hypothesis number 4, which is true to a matter of fact, you wouldn't believe it. In Bellevue, I went down to the police station and I asked them, do I have papers because I hadn't seen it since August 22nd. I went out the country, came back and forth, had been (inaudible), was at the swim club, and then I wanted to be clear and the police officers told me there weren't any papers. Could you believe that?

The trial court stated that Kane's question "gets into the facts of the case" and was "not an appropriate question for the jurors." After Kane confirmed he had

6

additional questions that did not go to the facts of the case, the court unmuted

the courtroom, and Kane asked the panel,

> Have people been following the news in recent artificial intelligence
> technology, tech spot developments? Yeah. Did anybody see that
> spooky article in San Francisco Tribune where the guy's girlfriend, it
> was a tech bot that was basically pretending that it was his
> girlfriend who had passed away, and she was pretending like she
> was speaking to him from beyond the grave? San Francisco
> Tribune tech (inaudible). It's wild. Yeah. All right. Yeah. Do people
> think that Microsoft technology could have beat San Francisco and
> that I could be behind the times and that this stuff could have been
> going on in Bellevue for longer than I ever thought with electronics?
> Bellevue's spooky. Yeah. There's a lot of coincidences that
> doppelgangers and technology stuff, it freaks me out. All right,
> that's about it. We can talk about technology. I'd ask you guys to
> look up the AI tech spot, the deep AI stuff from San Francisco and
> the fact that my neighbor was director of encryption at Microsoft.

The State objected, and the court sustained the objection, reminding the jury it

was "not to do any research into the law or the facts of this case." Kane then

indicated he did not have any more questions for the panel, and the court

released the panel for the day.

After a recess, the trial court indicated it was "going to raise some

concerns that [it] ha[d] about Mr. Kane." It then engaged him in a colloquy to

"make a record with regard to [his] state of mind." The trial court asked Kane if he

could tell it what the charges against him were, and Kane responded, "It has

gone from three to five charges because originally, they brought it with three

charges, meaning burglary with the addendum DV, which is quite – well, to say

that's a charge, and simple DV burglary, interference with DV investigation,

violation of TPO." Kane added, "Then the part where I'm trying not to digress into

legal logic here, they made two of the same charges, misdemeanor violation of a

TPO, which they've subsequently been debating about the date and the timing of the violations of." The court then asked Kane what the best and worst outcomes in the case would be. Kane responded, "The best outcome is equally weighted, mistrial, not guilty or case dismissed based on gross misappropriation of the prosecution," and, "The worst possible outcome is a guilty finding with a prison sentence." When asked to describe jury selection, Kane responded, "It's to determine a fair and equitable selection of your peers so that they may render a verdict," and when asked about the purpose of trial, Kane explained that it was "to determine guilt or innocence of the accused" and "to assess whether or not the defendant has broken the law."

When asked about the prosecutor's role, Kane responded, "The prosecutor's role is to represent the State while maintaining the ethics of the law." The court then asked Kane if the prosecutor was adversarial, and Kane responded, "They have informed me that they're adversarial to me, yes." When asked whether he understood what that meant, Kane responded, "I do," and,

> If I may, just given my education, the fact that my mother was in fact a journalism major and just kind of delve into the ethos of the words before saying that obviously, adversarial, in the summation, the correct answer is going to be that they're against me.
> But what I'm saying is that they really shouldn't be against me as an American. What they should be is for the law. And what I'm concerned with, actually, is some pathos that could be against me personally, based upon where I've lived or prior interactions or preconceptions and biases. Because ideally as an American who got A's in government and wasn't a regular gifted and talented, meaning I had the test scores, I understand that the prosecutor is supposed to represent the good of the public, the good of the people, and maintain the integrity of the written law of the State. And unfortunately, to some people in Capitol Hill, the federal government. And I don't know if my political views or my

8

interactions in Capitol Hill were in fact interacting with some of the (inaudible) party may have in fact unintentionally biased another member of the same neighborhood in Capitol Hill. And it's become quite confusing to me.

The court replied, "All right, so let's talk a little bit about that confusion. We talked the other day, you had mentioned that maybe you thought you knew [one of the prosecutors], is that correct?" When Kane responded yes and the court reminded him of the earlier colloquy during which Kane indicated that he was satisfied with the prosecutor's response, Kane said,

> And sometimes I rush to make agreements too early in my discussions. I have in fact served as an intern at US Congress. Given my five-year surgical residency,[3] I've realized that sometimes it's better to avoid little quibbles in the interest of maintaining a relationship.
> However, as our relationship is progressing, I'm pretty sure of what I saw, I've seen in the past and my interactions with him in the past. Whether or not he doesn't remember me or is representing things differently or is playing a word game that I don't understand, I'm fairly confident that I've had an interaction with him outside of the courtroom in the past.

The court expressed its "concern[ ] that [Kane was] very fixated on this issue when [the prosecutor] has already indicated . . . that he's not interacted with [Kane] before," to which Kane responded, "So now it's one person's word against the other," and the court replied, "It is." Kane then stated, "Given the abundance of prosecutors and the fact that I in fact do have an MD, I'm able to carry on," while pointing out that the prosecutor "could be in fact misrepresenting the truth or he could have forgotten or he could have been under the influence of a number of substances, being a resident of Capitol Hill, knowing how abundant

---

[3] It is undisputed that Kane once practiced as a medical doctor and completed a residency at George Washington University, specializing in otolaryngology.

the drug use is there."

The trial court then asked Kane whether he believed he could represent himself, and "pay attention and not be distracted by other things, including this thing with [the prosecutor] and focus on your case?" Kane responded that he could. The court asked if Kane believed he was "able to think clearly enough to make decisions on [his] own behalf as [he] represent[ed him]self," and Kane responded,

> Yes. What I am getting at goes back to basically my daughter is in elementary school, and what I'm doing is I'm establishing precedent with this argument. I'm not trying to mislead you, meaning that at the elementary school, we are allowed to ask for certain accommodations as long as they're not distracting. What I'm saying is, things that would help me to minimize any distractions would be simply a cup of coffee and things like that. And being able to communicate with you that yes, I am able to focus on my case, but in order to help me perform at my highest potential, recognizing that certain simple accommodations could help quite a bit.

The court noted it had questioned Kane because it "had some concerns that [he] may be decompensating similar to some of the patterns that [he] exhibited when [he was] initially at Western State Hospital." Kane interjected,

> And that's something that I actually wanted to make a fundamental American and human rights point on, in the fact that decompensation, while may be debatable, ultimately what happens is when I get put around prisoners and inmates, where I'm normally a very organized person, I'm either going to be forced into solitary, which is terrible for my mental health or for anybody's mental health, which basically equates to torture equivalent to (inaudible) seriously. Or you put me in a tank with 15 other people who have poor hygiene, who are drug addicts, who have a history of real criminal acts, versus a 37-year-old father who worked in medicine and excelled at all levels of the American education system, where I have a blatant target on my back for being somebody who's either having money or somebody to be taken advantage of or somebody just to pick on because they're that bored.
> And I represent a certain segment of the population that they

identified with somebody who carries out, you name it, but the white male is a target. Okay? It's that simple. And I'm a small, simple, educated, actually liberal white male, but when I say that and they're like, oh, can you give me some soup? Oh, can you give me some coffee? And here I am starving, eating terrible food in jail for a crime that I believe I did not commit, for seven months in violation of my rights to a speedy trial. So sometimes it's more peaceful for me to let my mind wander because something very bad has happened here and I have the education to recognize it.

The trial court then stated although Kane was under "some stress" in the jail that might be playing a role in what it was seeing, including "some periods of rapid speech and some tangential thinking," it "d[id] not think that there is reason to believe that Mr. Kane is incompetent to stand trial."

The jury was sworn on August 1, 2023, and trial took place over the next two days. Aizhan and Dr. Rosales both testified, as did police officers who responded to the October 7 and 27 incidents. Kane elected not to testify. Additional facts about Kane's behavior at trial are set forth in the analysis section below.

The case was submitted to the jury on August 3, 2023. The next evening, Juror 14 e-mailed the bailiff indicating that one of the other jurors misunderstood something Juror 14 said and started shouting at her, and "[w]hen we got back, the 'lead' juror basically said we weren't allowed to speak on the topic from now on." Juror 14 asked, "Is this appropriate for the lead juror to tell everyone they aren't allowed to talk about things that they feel are relevant to the case, only to avoid a topic that is difficult for some individuals to discuss?" The juror also stated her back had been hurting and the stress of jury duty was taking a toll on her.

When court was back in session, the trial court addressed Juror 14's e-mail and asked the parties for input about how to proceed. The State suggested questioning Juror 14, while Kane asserted the trial court should declare a mistrial. The court did not declare a mistrial; instead, it brought Juror 14 in for questioning, and based on Juror 14's responses, the State suggested questioning all of the jurors, and Kane, who again insisted on a mistrial, said, "I'm more than happy to ask every juror what they think."

Upon further questioning, Juror 14 confirmed she was mentally or emotionally unable to continue serving for reasons unrelated to a disagreement about the evaluation of the evidence. The court indicated it planned to release Juror 14 on this basis. When the State requested clarification about whether the court intended to question the presiding juror, the trial court responded it would decide how to proceed after a lunch break. The court then asked, "So with that, is there anything else to address on the record?" The State responded, "Not from the State, Your Honor," and Kane did not weigh in. The trial court dismissed Juror 14.

When court reconvened, the trial court asked, "Anything to address before we bring in the jurors?" Kane again did not weigh in. Meanwhile, the State asked whether the court would inquire of the presiding juror. The court answered no and that it would instead instruct the reconstituted jury to disregard all previous deliberations and begin anew. The court also stated it would—and it later did— reinstruct the jury with Instruction No. 26 regarding jury deliberations. The jury found Kane guilty as charged on all counts.

After the verdict but before sentencing, Kane requested and was appointed counsel, who moved for another competency evaluation. The trial court granted the motion, and on November 16, 2023, it found Kane incompetent and ordered 90 days of restoration. On March 22, 2024, the court found Kane competent.

On May 7, 2024, Kane, still represented by counsel, filed a presentence report. Kane asserted therein he could not be sentenced because he was not competent at trial, and he "demand[ed] a hearing to determine whether he was competent during his trial." In support, counsel submitted three previously undisclosed jail kites[4] Kane sent in June and July 2023 as evidence of Kane's alleged incompetence at trial.[5]

The State opposed the request for a retrospective competency hearing, arguing that it should be evaluated as a motion for a new trial. It asserted Kane's motion was untimely under CrR 7.5(b), which requires a motion for a new trial to be served and filed within 10 days after the verdict, and that in any case, Kane had not demonstrated a basis for relief under CrR 7.5(a). At Kane's subsequent sentencing hearing, the court began by hearing defense counsel's argument on Kane's request, and counsel stated it was "appropriate" to frame Kane's motion as a motion for a new trial under CrR 7.5. Counsel then asserted it was not

---

[4] "Kites" are written jail communications from incarcerated people to jail or medical staff or to their lawyers. State v. Myers, 27 Wn. App. 2d 798, 806 n.3, 533 P.3d 451 (2023).

[5] In the jail kites, Kane stated among other things that he needed "to talk to the head doctor," jail was making him "crazy" and exacerbating his posttraumatic stress disorder, and he had just watched an "African warrior woman movie" that reminded him of "common Swahili beliefs about daughters, witchcraft, [and] thought crime" and he needed "to talk about this, maybe with a Swahili expert." (Some capitalization omitted.)

untimely because Kane "was a pro se incompetent defendant, and we were not appointed within that 10 day time period."

The trial court denied Kane's request for a competency evaluation both as untimely and on the merits. It imposed concurrent sentences of 26 and 13 months on Counts 1 and 2, respectively, and 364-day sentences for each of Counts 3, 4, and 5, to run concurrently with each other and with the sentences on Counts 1 and 2.

Kane timely appeals.

ANALYSIS

<u>Competency Evaluation</u>

Kane contends the trial court erred by not ordering a competency evaluation when it determined that there was reason to engage him in a colloquy during jury selection or at any point thereafter during the trial. We disagree.

1.  <u>Standard of Review & Legal Standards</u>

"The due process clause of the Fourteenth Amendment to the United States Constitution guarantees an accused the fundamental right not to stand trial if he is legally incompetent." <u>State v. McCarthy</u> (<u>McCarthy II</u>), 193 Wn.2d 792, 800, 446 P.3d 167 (2019). "This principle is codified under [RCW 10.77.600[6]], which states, 'No incompetent person shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues.' " <u>McCarthy II</u>, 193 Wn.2d at 800. "Incompetency" means "a person lacks the capacity to understand the nature of the proceedings against him or her

---

[6] RCW 10.77.600 was formerly codified at RCW 10.77.050.

or to assist in his or her own defense as a result of mental disease or defect." RCW 10.77.010(19). This court reviews a trial court's decision whether to order a competency hearing for an abuse of discretion. McCarthy II, 193 Wn.2d at 803. "Applying an abuse of discretion standard, a reviewing court will find error only when the trial court's decision is manifestly unreasonable or is based on untenable grounds." McCarthy II, 193 Wn.2d at 803.

" 'Chapter 10.77 RCW governs the procedures and standards trial courts use to [assess] the competency of defendants to stand trial.' " McCarthy II, 193 Wn.2d at 800[7] (quoting State v. Coley, 180 Wn.2d 543, 551, 326 P.3d 702 (2014)). Under former RCW 10.77.060(1)(b)(i) (2023), now codified at RCW 10.77.400(1)(b)(i),

> [w]henever there is a doubt as to competency, the court on its own motion or on the motion of any party shall first review the allegations of incompetency. The court shall make a determination of whether sufficient facts have been provided to from a genuine doubt as to competency based on information provided by counsel, judicial colloquy, or direct observation of the defendant. If a genuine doubt as to competency exists, the court shall [order a competency evaluation].[8]

A "genuine doubt as to competency" means "that there is reasonable cause to believe, based upon actual interactions with or observations of the defendant or information provided by counsel, that a defendant is incompetent to stand trial." RCW 10.77.010(15).

The legislature added the "genuine doubt as to competency" language to former RCW 10.77.060 effective July 23, 2023, just four days before the trial

---

[7] Alteration in original.
[8] Emphasis added.

court here raised concerns about Kane and "ma[d]e a record with regard to [his] state of mind." See LAWS OF 2023, ch. 453, § 3. Before July 23, 2023, the statute provided, "Whenever . . . there is <u>reason to doubt</u> [a defendant's] competency, the court . . . shall [order a competency evaluation]."[9] Former RCW 10.77.060(1)(a) (2022). Because the parties did not address this change in their initial briefing and relied solely on cases decided under the "reason to doubt" standard, we requested supplemental briefing. Therein, Kane argued the 2023 amendment "merely clarified the already existing process for determining when to order a competency evaluation" and that the fundamental inquiry "remains the same." The State argued the amendment "changed the competency procedure . . . by limiting [competency evaluations] to defendants who <u>genuinely</u> seem incompetent . . . , as opposed to those who simply <u>might be</u>."

Because the 2023 amendment was part of legislation expressly intended "<u>to reduce</u> the flow of competency referrals,"[10] LAWS OF 2023, ch. 453, § 1, we agree with the State that the "genuine doubt" standard is more stringent than the former "reason to doubt" standard. We do not decide today <u>how much more stringent</u>, though, because as further discussed below, the trial court did not abuse its discretion even under the former standard.

2. <u>Discussion – Kane does not show the trial court erred by not ordering a competency evaluation</u>

Where, as here, "there has been a determination that a defendant is competent to stand trial, a trial court need not revisit the issue of competency

---

[9] Emphasis added.
[10] Emphasis added.

16

unless some objective incident or event occurs where the court is provided with new information that indicates a significant change in the defendant's mental condition."[11] McCarthy II, 193 Wn.2d at 803. Here, the trial court had a tenable basis to conclude there was no significant change in Kane's mental condition creating a reason to doubt Kane's competency.

The McCarthy case is instructive. There, the State charged McCarthy with burglary in the first degree after he entered Kayla Gonzales's home based on delusional beliefs that Gonzales knew McCarthy's ex-wife and that his ex-wife was inside Gonzales's home. State v. McCarthy (McCarthy I), 6 Wn. App. 2d 94, 98-99, 429 P.3d 1086 (2018), rev'd, 193 Wn.2d 792, 446 P.3d 167 (2019). McCarthy had a long history of mental health issues, including a diagnosis of bipolar disorder with paranoid features. McCarthy I, 6 Wn. App. 2d at 98. In December 2014, the superior court found McCarthy incompetent based on an evaluation by Dr. Daniel Lord-Flynn. McCarthy I, 6 Wn. App. 2d at 103-04. In his interactions with Lord-Flynn, McCarthy had expressed his beliefs that Gonzales, his ex-wife, and law enforcement were involved in a baroque conspiracy against him. McCarthy I, 6 Wn. App. 2d at 102. Lord-Flynn opined that although McCarthy understood the nature of the proceedings against him, he could not make rational decisions about the prosecution. McCarthy I, 6 Wn. App. 2d at 103.

While McCarthy was committed for competency restoration, the court appointed Dr. Debra Brown to perform another evaluation, and in March 2015, Lord-Flynn performed another interview of McCarthy with Brown present.

---

[11] Footnote omitted.

McCarthy I, 6 Wn. App. 2d at 105. McCarthy complained about his attorney and claimed to have hired a new one—whose name he would not disclose—who opined that McCarthy's attorney was mentally ill. McCarthy I, 6 Wn. App. 2d at 105. After the interview, Lord-Flynn opined McCarthy was competent to stand trial because he could cooperate with his purported new lawyer. McCarthy I, 6 Wn. App. 2d at 105. Brown concluded, to the contrary, that McCarthy lacked the present ability to rationally assist in his defense. McCarthy I, 6 Wn. App. 2d at 105-06. She noted McCarthy had changed little since Lord-Flynn's first evaluation and had "continued to demonstrate symptoms of grandiosity, distrust, and paranoia" and to "falsely blame his attorney for his misfortunes and to wrongly accuse her of working in favor of the prosecution." McCarthy I, 6 Wn. App. 2d at 106. The superior court found McCarthy incompetent and ordered another 90-day restoration. McCarthy I, 6 Wn. App. 2d at 108.

In October 2015, Lord-Flynn and Brown interviewed McCarthy again, and they again disagreed about McCarthy's ability to assist his counsel. McCarthy I, 6 Wn. App. 2d at 109. McCarthy demanded a jury trial on his competency. McCarthy I, 6 Wn. App. 2d at 110. In January 2016, a jury found McCarthy competent to stand trial, and the superior court appointed him new counsel. McCarthy I, 6 Wn. App. 2d at 115. It later granted McCarthy's motion to proceed pro se. McCarthy I, 6 Wn. App. 2d at 116. The State subsequently raised concerns about McCarthy having delusions again, citing pleadings in which McCarthy said his ex-wife worked in the jail mailroom and intercepted his mail, and county officials had placed a "human plant" in his jail cell to provide him with

18

narcotics. McCarthy I, 6 Wn. App. 2d at 116-17. The court did not order a competency evaluation at that time but indicated it would monitor things. McCarthy I, 6 Wn. App. 2d at 118.

Thereafter, McCarthy engaged in unusual behavior, including filing a motion claiming that jail officers had denied him his medications and involuntarily intoxicated him and requesting an injunction requiring them to take urine samples; submitting medical records to the court mentioning a recent week-long depression during which he could not function and slid between bipolar opposites with no stability; accusing jailers of seeking to physically harm him once he became self-represented; filing multiple inmate grievances repeating his claims of toxic fumes at the jail; and filing a petition for a writ of habeas corpus accusing law enforcement of stalking him and conspiring with his family to create a crime he never committed. McCarthy I, 6 Wn. App. 2d at 119-21. At a later hearing, McCarthy additionally expressed concern that Gonzales—who had never met McCarthy's ex-wife—was romantically involved with her and conspired with her to isolate McCarthy in jail. McCarthy I, 6 Wn. App. 2d at 126. Neither the parties nor the court ever re-raised the issue of a competency evaluation; however, the court, after expressing concerns that "there's a mental health issue here," re-appointed counsel. McCarthy I, 6 Wn. App. 2d at 128-29.

A jury found McCarthy guilty as charged, and on appeal, McCarthy argued that at some point after the jury finding of competency, the superior court should have had reason to doubt McCarthy's competency and directed another evaluation. McCarthy I, 6 Wn. App. 2d at 130-31. Division Three agreed based

on McCarthy's behavior after the competency determination, which showed McCarthy was suffering from delusions similar to the ones he maintained at the time when he was incompetent. McCarthy I, 6 Wn. App. 2d at 131, 137-38.

The State appealed, arguing that Division Three had improperly engaged in an independent review of the record. McCarthy II, 193 Wn.2d at 795, 802. Our Supreme Court reversed Division Three. McCarthy II, 193 Wn. 2d at 795. In doing so, it observed that the "reason to doubt" standard "is 'not definitive, but vests a large measure of discretion in the trial [court].' " McCarthy II, 193 Wn. 2d at 803-04 (quoting City of Seattle v. Gordon, 39 Wn. App. 437, 441, 693 P.2d 741 (1985)). It distinguished McCarthy's case from State v. Marshall, 144 Wn.2d 266, 27 P.3d 192 (2001) (abrogated on other grounds by State v. Sisouvanh, 175 Wn.2d 607, 290 P.3d 942 (2012)), and State v. Fedoruk, 5 Wn. App. 2d 317, 426 P.3d 757 (2018), where the appellate courts held that the trial court erred by not ordering a competency evaluation. McCarthy II, 193 Wn.2d at 807. In Marshall, unlike in McCarthy's case, there was evidence from multiple experts that the defendant was not competent when he entered his plea, including testimony that the defendant suffered from a high level of brain atrophy and did not understand he could go to prison if he pleaded guilty. 144 Wn.2d at 271, 273-74. Also, the defendant pleaded guilty to premeditated murder despite stating he did not intend to kill the victim. Marshall, 144 Wn.2d at 272. In Fedoruk, the defendant had a long history of psychosis and a known history of rapid decompensation. 5 Wn. App. 2d at 319. Yet the trial court did not order a competency evaluation despite witnessing extreme behavior from the defendant, including screaming in an

20

unintelligible language, being unable to remain composed to the point he had to be physically restrained, interrupting witnesses, and collapsing on the floor. Fedoruk, 5 Wn. App. 2d at 326, 330. Moreover, a psychologist who evaluated the defendant within a week after trial concluded that he was in an acute psychotic state and was incompetent. Fedoruk, 5 Wn. App. 2d at 334.

Instead, the Supreme Court determined McCarthy's case was closer to State v. Lord, 117 Wn.2d 829, 822 P.2d 177 (1991) (abrogated on other grounds by State v. Schierman, 192 Wn.2d 577, 438 P.3d 1063 (2018)). McCarthy II, 193 Wn.2d at 807. In Lord, defense counsel moved for a competency hearing based on delusional statements his client made to jail staff, his request that counsel withdraw—which counsel characterized as irrational—and his insistence that his family not testify on his behalf at sentencing. 117 Wn.2d at 900. Jail staff testified that during transport from the jail to court, the defendant ranted and raved, and said " 'he had a conversation with the Lord and the devil and the devil asked him to drink a cup of his own blood to prove his innocence.' " Lord, 117 Wn.2d at 901. The trial court denied the motion, explaining that defense counsel made no assertion the defendant "was unable to recall or relate facts sufficient for defense counsel to proceed." Lord, 117 Wn.2d at 902.

The supreme court upheld this decision, Lord, 117 Wn.2d at 903, and in McCarthy, it characterized its holding in Lord as follows: "simply having delusions, without more, was not a sufficient showing that there was reason to doubt the defendant's competency." McCarthy II, 193 Wn.2d at 807. The McCarthy court went on to explain, "A defendant can assist in his own defense

21

when he 'possess[es] an adequate recall of the factual events involved in the charge against him, [is] able to communicate those recollections to his attorney, and ha[s] both an intellectual and emotional appreciation of the ramifications and consequences of the crime charged." McCarthy II, 193 Wn.2d at 806 (quoting 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 902, at 171 (3d ed. 2004)). It explained that the trial court's decision not to sua sponte order another competency evaluation for McCarthy was reasonable because "McCarthy's appellate counsel cannot identify any event, other than McCarthy's continuing delusions, to support the conclusion that McCarthy was incompetent to stand trial," and "counsel provides no evidence that any delusions affected McCarthy's ability to recall facts and communicate with his attorney during the trial." McCarthy II, 193 Wn.2d at 807. The court also stated that "if the issue of competency is 'fairly debatable,' failure to order a subsequent evaluation does not violate [former] RCW 10.77.060, and the trial court did not abuse its discretion." McCarthy II, 193 Wn.2d at 803[12] (quoting Sisouvanh, 175 Wn.2d at 623).

Kane's case is a close one, but as in McCarthy, the issue of Kane's competency at trial was at most fairly debatable. To be sure, Kane exhibited the tangential thinking and digression into grandiose, paranoid, or persecutory themes that Simpson noted in her January 2023 report. For example, in a pretrial motion to exclude photographs of Aizhan's injuries, Kane wrote he "d[idn't] understand why she submitted a photo of her birthmark and possibly her flank,"

---

[12] Internal quotation marks omitted.

noting that Aizhan "has a history of interesting seduction techniques." When it was revealed that certain electronic discovery materials had not been transmitted to Kane in the jail and the State argued that this failure was inadvertent and non-prejudicial, Kane accused the State of playing mind games and putting him in a position where he had to "either sound like [he was] being abrasive by arguing for the rule of law to apply" or "ignore everything" and "entrust[ ] some magical will of God or Microsoft."

During jury selection, Kane's questions were sometimes preceded by tangential monologues. In one instance, he asked the panel about George Orwell's book Animal Farm, and posed apparently semi-autobiographical hypotheticals about (1) "a woman born in a far-away land" and the "man who loved her" and wanted to "preserve her dignity against the exploitive nature of Microsoft, while remaining within the bounds of the laws while highlighting the flaws in the Seattle criminal justice system" and (2) "a man who was trained in medicine and surgery" who moved to Washington, whereupon "the locals began to insist, we don't know your schools, we don't know who you are." In another instance, Kane previewed a question about the definition of "liberty" with an anecdote about Robert Howard Taft and his son, Robert A. Taft, who Kane explained "wrote, When I say liberty, I mean liberty of the individual to think his own thoughts and live his own life as he deserves to think and live." Later in the same exchange, Kane asked if anyone "had a loved one die of cancer," promising that "[i]t all ties together in the end" before the trial court redirected him. He also asked if anyone thought "the Bill and Melinda Gates Foundation

could push for more software analysis of the genetic causes of cancer and antidotes that could be applied or repairs to specific genes in living human beings with the appropriate amount of funding."

Throughout trial, Kane expressed considerable frustration at being incarcerated and the lack of resources, such as word processing software, PowerPoint, and Westlaw, available to him. He indicated that being incarcerated was "torture" and that he was being targeted by other individuals in the jail for being an educated white male. And as previously discussed, Kane insisted he knew one of the prosecutors even though that prosecutor could not recall having ever met Kane; Kane later said he thought he went to grade school with the other prosecutor, which the prosecutor denied.

On multiple occasions during trial, Kane interjected with non sequiturs. For example, while arguing about the State's proposal to redact certain information from Aizhan's medical records, Kane said, "I understand that it's most likely that we do not want to provoke my wife's – do I sound Irish yet? Because I think that's what she wants." Later, Kane "point[ed] out that gentleman's also wearing a blue shirt, and if he left race behind we'd look almost exactly the same if we shaved our heads." Kane also queried, out of the blue, whether "they're playing word games with Molly Moon, referring to the full moon parties in Thailand where they used to take Molly."

Importantly, however, according to Simpson's evaluation, "the most impairing issues in [Kane's] presentation were <u>his inability to communicate</u> in a reasoned or logical manner <u>without digressing</u> to grandiose, paranoid, and

persecutory themes."[13] She also noted that Kane's "difficulty being interrupted or redirected" would "interfere with his ability to engage in productive conversation with his attorney, testify relevantly in court, benefit from explanations, or otherwise assist in developing his defense," and Kane's tangential thought processes would increase the likelihood Kane "would have difficulty attending to and following court proceedings." That is, Simpson did not deem Kane incompetent merely because of his symptoms but rather—consistent with McCarthy—because of the effect Kane's symptoms had on his ability to communicate, follow along at trial, and develop his defense. See McCarthy II, 193 Wn.2d at 807 (trial court's failure to sua sponte order a competency evaluation was reasonable where there was no evidence McCarthy's symptoms "affected McCarthy's ability to recall facts and communicate with his attorney"[14]). Similarly, in her May 2023 report opining Kane was competent, Carson stated Kane "demonstrated that he is currently capable of engaging in rational, relevant consultation/ discussion related to his legal case without significant symptom interference."[15] Like Simpson, Carson's focus was not on Kane's symptoms alone but, rather, on whether those symptoms interfered with his ability to communicate and develop his defense.

To those ends, although Kane struggled as any incarcerated pro se defendant would, he was not unable to communicate or develop his defense. To the contrary, Kane's defense theory was both clear and viable: Aizhan was lying;

---

[13] Emphasis added.
[14] Emphasis added.
[15] Emphasis added.

25

and the State did not satisfy its burden to show Kane was the person Aizhan encountered during the October 7 car incident, that he was at Aizhan's house on October 27, or that he sent the e-mails that were the basis for Counts 4 and 5. Had Kane been represented at trial, counsel might have made different decisions about how to present these theories to the jury. Importantly, though, Kane waived his right to counsel, the validity of that waiver is not at issue, and Kane had the right to represent himself and make his own strategic decisions. The fact that counsel might have made different decisions under the circumstances is not sufficient to call Kane's competency into question, nor is the fact that Kane was unfamiliar with trial practice and the rules of evidence and made decisions that drew multiple objections. Cf. State v. Vermillion, 112 Wn. App. 844, 850-51, 51 P.3d 188 (2002) (right of self-representation "is afforded a defendant despite the fact that exercising the right will almost surely result in detriment to both the defendant and the administration of justice," and even if the defendant does not "demonstrate technical knowledge of the law and the rules of evidence"); State v. DeWeese, 117 Wn.2d 369, 379, 816 P.2d 1 (1991) ("When a criminal defendant chooses to represent himself and waive the assistance of counsel, the defendant is not entitled to special consideration and the inadequacy of the defense cannot provide a basis for a new trial.").

Furthermore, despite his unusual behavior and manner of presentation, Kane was clearly able to attend to and follow the court proceedings and develop his defense theory. For example, Kane ably argued he should be able to call witnesses to impugn Aizhan's character—an issue on which the trial court

reserved. Similarly, Kane ably—though unsuccessfully—argued he should be able to testify about his own good character, including his educational and employment history. Although Kane had a rocky start in jury selection and asked several questions having to do with the facts of the case, once redirected, he pivoted and posed questions relevant to his defense. While this included some meandering hypotheticals, the "gist" of those hypotheticals—that there may be multiple explanations for an event—was clear. Moreover, and in stark contrast to Simpson's notes about her interview with Kane, which revealed that Kane did not understand the allegations against him or the possible outcomes and consequences thereof,[16] when the trial court questioned him, Kane articulated the charges against him—including the fact that the State had added two counts "which they've subsequently been debating about the date and the timing of"—as

---

[16] For example, according to Simpson's report, when Simpson asked Kane about the current charges, he first responded with "I'm not exactly sure." After consulting with his counsel, Kane "stated that he 'saw a piece of paper that said burglary, but the police told me something different.' " When asked if he recalled any other charges, Kane said, " 'I stopped paying attention because they were all made up.' " When Simpson asked Kane what was meant by burglary in the first degree, Kane "said, 'that means, accused, not that you've done anything. It means in some states you get a grand jury . . . in some states you get raped.' "

Also, according to Simpson's report, when she asked Kane about potential sentences, "Kane stated 'I could lose my medical license and everything I worked for, probably throw me in jail, throw me into poverty and thus damning my daughters as well.' " When asked about probation, "Kane stated it was, 'probably something else, go to the residency program director and say something happened because they don't want to be sued for doing something wrong.' " Even after being provided with education about the probation process and asked to summarize what he had been told, Kane "stated, 'I'm going to do telehealth, I'm leaving the state of Washington!' "

With regard to pleas, "Kane named, 'not guilty,' " and when asked about other pleas, he responded, " 'That should be the only option. There are some people who may be guilty, in other places you can plead the fifth.' " When Kane was asked what would happen next after a not guilty plea, he responded, " 'Then the case would be dismissed.' " When Simpson replied, "Automatically?" Kane responded, " 'It should, someone without evidence and 37 years old, with two kids, taken care of massive section of society, have a medical degree . . . ."

well as the possible outcomes and their consequences, and the purpose of trial.

During his opening statement, Kane made some obscure references, but his clear point—consistent with his theory he was not the man Aizhan saw on October 7—was that sometimes remarkable coincidences happen. Kane then followed up with sensible remarks about how the State could not prove he was at Aizhan's apartment, that the photos of Aizhan's injuries were actually abrasions, or that the e-mails that were the basis of Counts 4 and 5 were actually sent by "the Sean Kane standing before you." Later, while cross-examining Aizhan, Kane posed questions clearly suggesting she or someone she knew might have changed the date, time, or location of the photo of Kane that Aizhan claimed she took during the October 7 car incident. He also called into question whether the photos of Aizhan's injuries actually depicted shadows, bra marks, varicose veins, or a rash, rather than abrasions. While cross-examining Dr. Rosales, Kane questioned her about her credentials and the thoroughness of her notes and examination; he also got her to confirm she did not have direct evidence it was Kane who caused Aizhan's injuries and that her notes merely documented what Aizhan told her.

During closing argument, Kane started out with another obscure reference and argued he was "denied access to the internet or proper legal defenses." But after the State objected and the court redirected him, he pivoted to pointing out weaknesses in the State's case. For example, Kane argued the photos of Aizhan's alleged injuries did not depict bruises, that Aizhan sounded "remarkably calm" in the 911 call that was played for the jury, that Aizhan had the technical

ability to edit photos, that there was "no video, . . . no fingerprints, . . . no unbiased witnesses," that Aizhan had a motive because Kane and Aizhan had a dissolution case pending, there was no established chain of custody for the photographs, and there was no evidence linking the e-mail addresses to him. And when discussing jury instructions, Kane astutely asked why there was an instruction on assault when "[t]here's no assault charges," and the court explained that it was a predicate for the burglary charge.

In summary, although Kane at times digressed into tangents and visited the themes noted in Simpson's evaluation, the trial court had a tenable basis to conclude that Kane's occasional digressions did not affect his ability to recall facts or develop his defense. See McCarthy II, 193 Wn.2d at 807 (mere fact that McCarthy continued to experience delusions was insufficient to show trial court abused its discretion by not ordering a competency evaluation). Indeed, even the attorney who successfully obtained Kane's posttrial competency evaluation observed that Kane "was clearly competent during the jury trial" and "represented himself adequately," contrasting that with his more recent observations that Kane exhibited "persistent delusionary thinking, perseveration on tangential issues, and an inability to focus on the issues."[17] Kane fails to show the trial court abused its discretion by not ordering a competency evaluation during trial after a jury had found Kane competent.

Post-verdict Motion for Competency Evaluation

Kane next argues the trial court erred by denying his post-verdict motion

---

[17] Emphasis added.

29

for a retrospective evaluation to determine if he was incompetent at trial. We disagree.

Kane did not specify the basis for his request for a retrospective hearing, which he made within his presentence report. In its response, the State analyzed Kane's request as a CrR 7.5 motion for a new trial. At oral argument before the trial court, Kane's counsel stated,

> I . . . had a chance to review the State's response framing the issue as a motion for a new trial under Court Rule 7.5, which I believe is appropriate. The defense motion is a competency hearing for the purposes of assessing Dr. Kane's competency at trial and if he was not competent to request a new trial.

Accordingly, while Kane asserts the trial court "was wrong to view this motion through the CrR 7.5 lens," he fails to show the trial court erred by doing so when that was the framework the parties agreed upon.

Under CrR 7.5(b), a motion for new trial must generally be served and filed within 10 days after the verdict, though "[t]he court . . . may in its discretion extend the time." The jury returned its verdict on August 9, 2023, and Kane filed his presentence report, including his motion, on May 7, 2024. This was well past the 10-day deadline, even considering the intervening period when Kane was incompetent. Accordingly, the trial court did not err by denying Kane's request as untimely.

Kane disagrees and points out that below, defense counsel "pointed out the issue is due process related and that appellate cases have allowed [*sic*] to raise the same issue on appeal without concern for timeliness." Those cases, which Kane again cites on appeal, were State v. Wright, 19 Wn. App. 381, 575

P.2d 740 (1978), and State v. P.E.T., 174 Wn. App. 590, 300 P.3d 456 (2013). But Wright involved a motion for postconviction relief under former CrR 7.7, which was "superseded by the rules pertaining to personal restraint petitions," 19 Wn. App. at 383 n.1; and in P.E.T., the defendant challenged the trial court's determination, following an actual competency hearing, that he was competent. 174 Wn. App. at 594-95. Neither case has any bearing on whether Kane's request for a retrospective hearing was timely under CrR 7.5.[18]

Juror 14

Kane next asserts the trial court erred by not further investigating Juror 14's claims about the original presiding juror. The State contends Kane failed to preserve this issue for review. We agree with the State.

This court generally will not review an issue raised for the first time appeal. State v. Trout, 125 Wn. App. 313, 317, 103 P.3d 1278 (2005). "There is an exception—a narrow exception—for certain constitutional questions." Trout, 125 Wn. App at 317. "But the error must meet the criteria of a 'manifest error affecting a constitutional right.' "[19] Trout, 125 Wn. App at 317 (quoting State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995)); RAP 2.5(a)(3).

Here, the trial court took some time to consider and decide how to address Juror 14's claims about the presiding juror's conduct, and Kane had ample opportunity to ask the court to further investigate those claims. But he did not do

---

[18] Neither party argued below, and neither party argues on appeal, that Kane's motion should be analyzed as a CrR 7.8(b) motion for relief from a proceeding. Accordingly, we do not treat it as one.
[19] Internal quotation marks omitted.

so, instead asserting the court should immediately declare a mistrial.[20] Kane also did not object after the trial court indicated it did not intend to question the presiding juror. Indeed, even on appeal, Kane does not claim he objected to the trial court's handling of the Juror 14 issue. Rather—and without explaining why his request for a mistrial would be sufficient to preserve the issue for review—he contends, "Even assuming, *arguendo*, that [his] motion for a mistrial did not preserve this issue, it is still reviewable . . . [as a] manifest error[ ] of a constitutional dimension."

Kane is incorrect. "To establish manifest error, '[t]he defendant must make a plausible showing that [an alleged] error' affected his or her rights at trial and 'resulted in actual prejudice, which means that the claimed error had practical and identifiable consequences in the trial.' "[21] State v. St. Peter, 1 Wn. App. 2d 961, 962-63, 408 P.3d 361 (2018) (quoting State v. Lamar, 180 Wn.2d 576, 583, 327 P.3d 46 (2014)). Kane cannot make this showing. He premises his claim of manifest error on his assertion the trial court infringed his right to be tried by an impartial jury free of disqualifying misconduct. See State v. Tigano, 63 Wn. App. 336, 341, 818 P.2d 1369 (1991) ("Article I, § 21 of the Washington Constitution provides that '[t]he right of trial by jury shall remain inviolate . . . .' The right of trial by jury means a trial by an unbiased and unprejudiced jury, free of disqualifying jury misconduct."). But nothing in the record reveals the jury that convicted Kane was partial or any juror engaged in disqualifying misconduct. Therefore, we decline to consider Kane's claim the trial court erred by not further investigating

---

[20] Kane does not challenge the trial court's decision not to declare a mistrial.
[21] Alterations in original.

Juror 14's claims. Cf. State v. Guevara Diaz, 11 Wn. App. 2d 843, 854, 456 P.3d 869 (2020) (reviewing claim of juror bias for the first time on appeal where a juror's bias was established by the record because she stated she could not be fair).

Sufficiency of the Evidence

As a final matter, Kane argues the State presented insufficient evidence to support the jury's finding of guilt on Count 3. We agree.

"To determine whether sufficient evidence supports a conviction, [this court] view[s] the evidence in the light most favorable to the State, and determine[s] whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." State v. Stewart, 12 Wn. App. 2d 236, 239, 457 P.3d 1213 (2020). "[S]ufficiency challenges admit the truth of the State's evidence and all reasonable inferences that can be drawn from it." Stewart, 12 Wn. App. 2d at 240. This court "defer[s] to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." Stewart, 12 Wn. App. 2d at 240. That said, evidence is not sufficient if the fact finder must guess or resort to speculation or conjecture. State v. Hutton, 7 Wn. App. 726, 728, 502 P.2d 1037 (1972).

Here, the to-convict instruction for Count 3 stated, "To convict [Kane] of the crime of Interference With the Reporting of a [DV] Offense," the jury had to find, among other things, that Kane "prevented or attempted to prevent Nuriya Imasheva . . . from calling a 911 emergency communication system or obtaining

33

medical assistance or making a report to any law enforcement officer."[22] Accordingly, Nuriya Imasheva's identity became an element the State was required to prove. See State v. Johnson, 188 Wn.2d 742, 760, 399 P.3d 507 (2017) (under law of the case doctrine, "unless the State objects, the to-convict instruction defines the essential elements of a crime").

The State failed to do so. Aizhan testified it was her sister who tried to call 911 during the underlying incident. As the State concedes, Aizhan never identified her sister by name while testifying. Later, on cross-examination, Kane questioned Aizhan about the photograph Aizhan took during the October 7 car incident and whether anyone she knew could have manipulated it for her. The State points out during that questioning, Kane asked Aizhan, "Is Nuriya a talented photographer and comfortable with iPhone technology," and Aizhan responded, "No, my sister is not a photographer." While this testimony supported a reasonable inference Aizhan had a sister named Nuriya, the State identifies no evidence from which the jury could reasonably infer, without speculating, that Nuriya was the same sister who was at Aizhan's home on October 27.[23] Accordingly, the evidence was insufficient to support the jury's finding of guilt on Count 3, and we reverse that conviction.

We reverse Kane's conviction of interfering with DV reporting and remand to the trial court to vacate that conviction. Otherwise, we affirm.

---

[22] Emphasis added.

[23] Had Kane asked, "Is your sister a talented photographer and comfortable with iPhone technology," and had Aizhan responded, "No, Nuriya is not a photographer," then the jury could have reasonably inferred Nuriya was Aizhan's only sister and, thus, was the same sister who was at Aizhan's home during the underlying incident. But that is not what occurred.

WE CONCUR:

Bui, J.

Díaz, J.

Coburn, J.